# Illinois Official Reports

## Appellate Court

---

### *People v. Hardimon*, 2017 IL App (3d) 120772

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRIN C. HARDIMON, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0772 |
| Filed | May 12, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 11-CF-124; the Hon. Timothy M. Lucas, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Robert E. McIntire, of Acton & Snyder LLP, of Danville, for appellant.<br><br>Jerry Brady, State's Attorney, of Peoria (Dawn D. Duffy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justices Schmidt and Wright concurred in the judgment and opinion. |

# OPINION

¶ 1    The defendant, Darrin C. Hardimon, appeals from his convictions for first degree murder and unlawful possession of a weapon by a felon (UPWF). On appeal, the defendant argues that (1) he received ineffective assistance of trial counsel and (2) his UPWF conviction must be reversed.

¶ 2                                                    FACTS

¶ 3    The defendant was charged by indictment with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)) and one count of UPWF (720 ILCS 5/24-1.1(a) (West 2010)). The UPWF charge alleged that the defendant

> "knowingly possessed on or about his person or on his own land or in his own abode a firearm having been previously convicted of a felony violation of Article 24 of the Illinois Compiled Statutes, being aggravated unlawful use of a weapon, in Peoria County Case 08 CF 1317."

¶ 4    Before the jury trial commenced, the parties entered a stipulation that the defendant had a prior conviction for an article 24 felony. Due to the stipulation, the State said that it did not "believe that the actual offense being aggravated unlawful use of a weapon is required to be disclosed to the jury." The State suggested that the court refer to the predicate offense as an "[a]rticle 24 [f]elony."

¶ 5    At trial, the State called Peoria police officer Jon Briggs to testify as its first witness. On February 6, 2011, Briggs was patrolling the area around Club Apollo. At approximately 3:50 a.m., Briggs heard 7 to 10 gunshots followed by a second volley of 7 to 10 gunshots. Near Club Apollo, Briggs saw the victim, Jerrell Hartwell, lying on the ground. Hartwell had been shot in the abdomen, and Briggs called for an ambulance.

¶ 6    Telekia Lyles testified that she was at Club Apollo on the night of the shooting. Before the club closed, Lyles went out to warm up her vehicle. While sitting in her vehicle, Lyles heard several gunshots. Lyles turned and saw a man pointing a gun at an individual lying in the snow. Lyles gave a Club Apollo security guard information on the make, model, and license plate number of the shooter's vehicle. Lyles's handwritten note identified the vehicle as a black Eclipse, license plate No. L101306. Lyles said the shooter was wearing a black hat and black shirt.

¶ 7    Anthony Carter testified that he owned a black Mitsubishi Eclipse, license plate No. L101306. On February 5, 2011, Carter loaned the vehicle to TC Driver. Earlier in the day, before Driver picked up the vehicle, Carter saw Driver with the defendant. The next morning (February 6, 2011), Carter noticed that a gray Camaro that belonged to the defendant was parked in his lot. Later in the day, the Eclipse was returned to Carter's lot. Driver told Carter that he did not return the vehicle on the morning of February 6, 2011, because he had gotten drunk.

¶ 8    Early Johnson testified that he was a security guard at Club Apollo. Around 2 a.m. on February 6, 2011, Johnson observed Hartwell and the defendant arguing in the men's restroom. Johnson directed the men to end their argument, and Hartwell left the restroom. The defendant remained in the restroom, and Johnson directed him to leave the club. Johnson began to escort the defendant out of the restroom when he was called to another incident.

Thereafter, Johnson again told the defendant to leave the club. The defendant became frustrated and said, "I'll air this bitch out." Johnson had heard this statement before and opined that it meant there would be "gun play." Johnson then escorted the defendant out of the club. After Club Apollo started to close, Johnson noticed that Hartwell had been shot.

¶ 9    On cross-examination, Johnson said that he had described the defendant as "dark-skinned." However, when Johnson was asked for clarification, he stated that he was not sure that he would have described the defendant as "dark complected." Johnson said "[l]ooking at [the defendant], I'm certain I wouldn't have said that" he was a dark-skinned person.

¶ 10   Peoria police officer Paul Tuttle testified that on February 7, 2011, he photographed and searched the black Eclipse (Anthony Carter's vehicle) that was connected to the shooting at Club Apollo. The vehicle did not contain any firearms, bullets, or shell casings. Tuttle located a maroon-colored coat inside the vehicle.

¶ 11   Forensic scientist Linda Yborra testified that she analyzed the shell casings and bullet jacket fragments found at the scene, as well as three bullets removed from Hartwell's body. Yborra determined that each of the three bullets had been fired from the same weapon. Yborra also concluded that each of the casings had been ejected from the same firearm. Yborra could not identify whether or eliminate the possibility that the bullet jacket fragments had been fired from the same weapon. Yborra did not have a firearm to compare the bullets, fragments, and casings to.

¶ 12   Detective James Feehan testified that he reviewed the video surveillance recorded by the security cameras at Club Apollo. Surveillance video from camera No. 1 showed that shortly after 3:50 a.m., a crowd formed near the entrance of the club. As the crowd dispersed, a black male wearing black clothing pointed a gun toward the area in front of Club Apollo. After firing several shots, the black male walked away through the parking lot. Surveillance camera No. 2 recorded the parking lot area. At 3:51 a.m., an individual dressed in black walked toward a black vehicle. The individual entered the passenger side of the vehicle, and the vehicle left the parking lot. Surveillance camera No. 3 showed several individuals as they entered Club Apollo. Surveillance camera No. 11 showed the area directly in front of Club Apollo. At the beginning of this recording, a crowd of people was seen standing near the front of the club. A few seconds later, the crowd rapidly dispersed, and the shooting victim fell into a snow bank. Shortly thereafter, the police arrived on the scene.

¶ 13   Detective Steven Garner testified that he had reviewed the surveillance videos. Garner said that surveillance camera No. 3 showed the entryway to Club Apollo. Garner identified one of the individuals entering the club as Driver, whom he recognized from a prior interaction. Garner also noted that Driver was deceased at the time of the trial. Garner thought that he saw the defendant walking into the club in front of Driver, but he could not make a conclusive identification from the video recording. After viewing the surveillance videos, Garner could not determine if the defendant was anywhere on the scene at the time of the shooting.

¶ 14   During his investigation, Garner asked Johnson to review a photographic lineup. Johnson identified the defendant as the individual he escorted out of Club Apollo after the argument in the restroom.

¶ 15   On February 8, 2011, Garner interviewed the defendant at the Peoria police station. The interview was video recorded. Prior to trial, the parties discussed the redaction of the recording. The original recording was more than four hours in length, and the State indicated that it had redacted approximately three hours of the video where the defendant was not

actively interviewed. The State also redacted portions of the video where the detectives asked the defendant if he had received *Miranda* warnings on a prior occasion, as well as references to information that Driver had told to the police. Defense counsel did not object to the introduction or playing of the redacted video.

¶ 16    At the beginning of the video recording, Detective Garner introduced himself and Detective Moore to the defendant and stated that they were speaking with the defendant about the February 6, 2011, murder at Club Apollo. Before providing the defendant with a *Miranda* waiver form, Garner asked the defendant (1) if he had heard about the shooting, (2) his highest level of education completed, and (3) his address. The defendant answered the questions and then directed his attention to the written *Miranda* waiver. While defendant reviewed the waiver, Moore told the defendant that it was "a technical issue, man. Everybody has got to get it." In response, the defendant said "I am trying to understand it. You said everybody gets the paper." Moore asked if the defendant felt like he was free to leave and explained that the *Miranda* warnings were not determinative of whether the defendant was going to jail but were a "custody issue." Moore explained that anyone walking by the room would think the defendant was in custody because he was sitting across from the door, behind a table, with two men between the defendant and the door. Garner stated that it was like "you see on television where you read your rights." The defendant said that he did not understand the last line of the *Miranda* waiver regarding the voluntariness of his waiver. Garner and Moore explained that the line indicated that the detectives were not threatening or promising the defendant anything in exchange for his statement. Following this explanation, the defendant signed the waiver.

¶ 17    The defendant explained that, on the night of the shooting, he went to Club Apollo with an individual he called "Unc," whom Garner later identified as TC Driver. The defendant described Driver as a light-skinned male. The defendant said that he wore a maroon-colored coat and Driver wore a plaid shirt to the club. Around 11 p.m., the defendant and Driver drove to Club Apollo in a black two-door Mitsubishi. The defendant explained that the Mitsubishi was owned by the defendant's cousin, Anthony Carter.

¶ 18    At Club Apollo, the defendant and Driver sat at the bar, had a few drinks, played pool, and left after the bartenders announced the last call. The defendant was with Driver the whole night, and neither of them used the restroom during their time at Club Apollo. The defendant said that he did not get into any arguments while he was at the club and he did not own a firearm. Around 3 a.m., the defendant was sitting in the Mitsubishi, which was parked facing Club Apollo, when he saw a group of men standing outside the club. The defendant heard gunshots, and he and Driver left the parking lot. Later, Driver dropped the defendant off at his girlfriend's house.

¶ 19    Approximately 26 minutes into the interview, Garner and Moore confronted the defendant with allegations that the defendant had been involved in an earlier argument at Club Apollo. At this point, the detectives' tone changed from one of fact gathering to pressing the defendant to tell them what happened. The detectives told the defendant that other evidence indicated that he had been involved in an earlier argument at Club Apollo and he left the club in a Mitsubishi that matched the description of the shooting suspect's vehicle. Moore explained that the case would be presented either as one of self-defense or cold-blooded murder. Garner encouraged the defendant to tell the detectives what had happened and to explain if the shooting was an act of self-defense. The defendant repeatedly denied any involvement in the shooting.

¶ 20 During the interview, the detectives said the defendant was hiding in his girlfriend's basement when the police came to bring him to the station. Garner noted that the officers at the house were prepared to send a canine into the house to force the defendant out. The defendant replied that he voluntarily came out of the basement and an officer thanked him for his cooperation.

¶ 21 Approximately 37 minutes into the video, Garner indicated that the defendant should "man[ ] up to what happened." The defendant maintained that he had done nothing wrong and reconfirmed that he left Club Apollo and went directly to his vehicle. Moore explained that the police had a different version of events that implicated the defendant in the shooting and the detectives could seek a lesser charge if the defendant explained that he acted in self-defense. The defendant said he had not spoken to Hartwell on the night of the incident. Approximately five or six minutes later, Garner and the defendant went over the defendant's version of events. The defendant maintained that he was sitting in the Mitsubishi when the shooting started, at which point the defendant left the scene. Moore insisted that the defendant had left information out, and Garner implied that the defendant was involved in the earlier argument in the men's restroom. Moore said the surveillance video showed the defendant leaving Club Apollo before 3 a.m. and returning in a black Mitsubishi, which backed into a parking spot. At that point, Garner alleged that the video showed the defendant getting into a dispute with Hartwell, firing several shots, and calmly walking back to the Mitsubishi. Garner then told the defendant that the defendant "showed no remorse for what happened. It's like I don't care. I'm going handle my business." The defendant said that he did not commit the shooting, and Garner replied "yes, you did. You can sit there and say that all day, but the facts is [*sic*] the facts." Moore said that a show of remorse or responsibility would go "a long way in Peoria County." Moore commented that the State would take this case to trial because "it is easy" and this type of case provided good publicity for the State's Attorney and leads to "100-year, triple digit sentences."

¶ 22 As an example of the damage caused by not showing remorse, Moore told the defendant that he worked a prior case involving a drug deal that turned into a shooting and attempted murder prosecution. The detectives did not have video recorded evidence of the shooting, but the individuals involved in the drug deal identified the shooter. Moore told the instant defendant that the detectives "don't blow smoke up people's ass. We tell it like it is. Okay? Just like we are doing to you." Moore then returned to his anecdote stating the detectives interviewed the shooter and laid out the evidence against him. The shooter showed no remorse and was convicted and sentenced to 95 years' imprisonment. Moore emphasized that the lengthy sentence was imposed even though the victim survived the shooting. Garner told the instant defendant that "now is the time to talk." The defendant reiterated that he had told the detectives everything he knew and the detectives were trying to force him to make a different statement. Garner responded that he was not trying to make the defendant say anything.

¶ 23 Approximately 54 minutes into the video, Garner said the detectives knew the defendant committed the offense and he needed to tell the detectives why he fired the shots. The defendant again denied committing the shooting, and the following exchange took place:

> "[Moore:] We don't get people in here, okay, just to belittle them. We get people in here to get to the bottom of shit. Okay? We don't lie to people. Because, you know, say something happens. Okay. You get convicted. Next thing you know, Judge Mary McDade says, uh, you know what I think he's served his time. You know? He is claiming in his appeal that he was scared to death of this dude. You know? When they

- 5 -

see the picture of the guy, sure that's believable. So the next thing you know it gets overturned. Alright? And, or they say he's served enough time, we're going to make it second degree murder because he was scared of this dude. He thought dude was going to come after him. So they cut you loose. Alright? That might be 10 years from now. Okay? Him and I are working another murder case. Say it's one of your family members that gets murdered. Are you going to want to talk to us if we have been blowing smoke up your ass? No. That's why we don't do it. Because we need people to talk to us.

[Garner:] Our rep, our rep is always important to us.

[Moore:] We don't lie to people. We just tell—this is the way it is. You know? The damage is done. Now is the time to just make the best of it. That's all you can do. But, given the opportunity, which is what you are being given now, is to tell your side, there is a reason that shit happens, so that they know what is going, the State's attorney's office. Now is the time to do it. That is just the way it is.

[The defendant:] You all are questioning me. I told you what I know."

Moore then explained that Driver was also "going down for murder, too" on an accountability theory. The defendant asked if he was personally being charged with murder, and the detectives responded that the defendant was being charged with murder. Garner again told the defendant that this was his opportunity to explain his side of the story. Moore then told the defendant that they were taking the case to trial because the prosecution wanted to "show this shit off" and it makes for a good trial. Moore implied the video recording would have the jurors on the edge of their seats looking at the defendant with disgust. Moore implied that the news media would use the word "execute" next to the defendant's picture. Moore repeatedly implied that the prosecution had a strong case against the defendant, as the video clearly established his guilt, and the detectives were providing a favor to the defendant by seeking his honest explanation. The defendant again insisted that he had told the detectives what had happened.

¶ 24    Approximately one hour and 13 minutes into the interview, Moore told the defendant that the next time he may see his son will be when the defendant is "passing [his son] in [the Department of Corrections] in 20 years *** because his dad is all locked up." Two minutes before the end of the video, Moore told the defendant that he was going to jail for first degree murder. The detectives then exited the interview room. Shortly thereafter, Moore returned and questioned the defendant about the coat he was wearing on the night of the shooting. Moore explained that if the defendant gave the prosecution his current version of events, they would "bend [him] over." The defendant responded "how many times do I gotta keep saying it man. I told you what happened, man." Moore then left the room, and the video ended.

¶ 25    At the conclusion of the State's case, the defendant elected not to testify, and the defense rested without presenting evidence. At the jury instruction conference, the State tendered Illinois Pattern Jury Instructions, Criminal, No. 3.13X (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.13X), which stated:

"Ordinarily, evidence of a defendant's prior conviction of an offense may not be considered by you as evidence of his guilt of the offense with which he is charged.

However, in this case, because the State must prove beyond a reasonable doubt the proposition that the defendant has previously been convicted of an article 24 felony,

you may consider evidence of defendant's prior conviction of *** an article 24 felony for the purpose of determining whether the State has proved that proposition."

Defense counsel asked the court not to provide IPI Criminal 4th No. 3.13X to the jury. The court responded:

"I've just noted for my own notes and for the common law record that you've indicated that you do not wish to have it tendered nor given to the jury as compared to it being withdrawn or anything like that, okay?

[Defense counsel:] Yes, [Y]our Honor."

¶ 26    The State began its closing argument with the defendant's statement "I'll air this bitch out." The State described the defendant's words as a "statement of intent," which was later carried out. While recapitulating the evidence, the State argued that the defendant expressed his intent as he was escorted out of Club Apollo and said "I'll air this bitch out." The State then recited Johnson's opinion that the defendant's statement indicated the potential for "gun play." The State espoused that, after the defendant was removed from Club Apollo due to his dispute with Hartwell, he retrieved his firearm and returned to the club to wait for Hartwell to leave.

¶ 27    During its closing arguments, defense counsel said the State "talked about the fact that [the defendant] was convicted before of a felony, UUW [unlawful use of a weapon], possession of a weapon." The defense argued that the State presented no evidence that showed the defendant had a gun and no one identified the defendant as the shooter.

¶ 28    The court instructed the jury, in part, that

"[c]losing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 29    When deliberations concluded, the jury found the defendant guilty of first degree murder and UPWF. The court sentenced the defendant to 80 years' imprisonment for first degree murder and a consecutive term of 14 years for UPWF. The defendant filed a motion to reconsider sentence, which the court denied. The defendant appeals.

¶ 30                                    ANALYSIS
¶ 31                        I. Ineffective Assistance of Counsel
¶ 32    The defendant argues that trial counsel was ineffective for failing to file a motion to further redact the video recording of the defendant's police interview. The defendant contends that the final two-thirds of the video recording should have been redacted because it was irrelevant and more prejudicial than probative. We find that counsel's failure to seek further redaction of the interview video requires reversal and remand for a new trial.

¶ 33    To establish that he received ineffective assistance of counsel, the defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). To satisfy the deficient performance prong, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010).

To establish the prejudice prong, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. That is, "[t]he defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). In weighing the impact of counsel's errors, we consider the totality of the evidence before the finder of fact. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 47.

¶ 34    The defendant argues that counsel was ineffective for failing to move to further redact the video recording of the police interview. The defendant asserts that the detectives' repeated statements regarding their theory and strength of the case constituted irrelevant and prejudicial evidence. Specifically, approximately 20 minutes of the video contained the defendant's relevant admissions about his location at the time of the shooting. The remainder of the video consisted of prejudicial statements that (1) described, in detail, a scenario where the defendant shot the victim because he was afraid; (2) attacked the defendant's character and credibility, which included the State's potential use of the words "liar," "cold-blooded killer," and "execute," at trial; (3) served to bolster the testimonies of the officers and other prosecution witnesses; (4) described the contents of the surveillance video, while inaccurately vouching for the clarity of the video; (5) claimed the case would be easily prosecuted; and (6) indicated the defendant hid in his girlfriend's basement when the police came to arrest him, which indicated knowledge of guilt.

¶ 35    Generally, statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response. See *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33 (observing that, without the officers' statements in the video, the defendant's responses would have been nonsensical). However, a police officer's opinion statement regarding the ultimate question of fact possesses significant prejudice as the officer is a recognized authority figure. See *People v. Munoz*, 398 Ill. App. 3d 455, 487 (2010) (admission of officer's testimony regarding the defendant's veracity was error); *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001) (police officer's testimony that he believed the defendant to be guilty was reversible error). An officer's testimony or statement during a video recorded interrogation is ultimately subject to relevancy requirements, as well as the familiar test weighing probative value versus prejudicial effect. *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000). A statement should be excluded from evidence where its probative value is outweighed by its prejudicial effect. *Id.*

¶ 36    Here, during the first one-third of the interview, the defendant and the detectives had a conversation about the defendant's whereabouts and knowledge of the shooting at Club Apollo. Around the 30-minute mark, the interview shifts from a conversational tone to accusations that the defendant committed the shooting. During the remaining 50 minutes of the recording, the defendant adamantly denied the detectives' accusations that he was involved in an argument at Club Apollo and was removed from the club. The defendant also consistently denied the detectives repeated assertions that the defendant returned to Club Apollo with a gun and shot Hartwell. In spite of the defendant's insistence, Garner and Moore goaded the defendant to confess to the offenses by suggesting that the defendant will receive more lenient treatment if he shows remorse and takes responsibility for the shooting. At several points during the interview, the detectives claimed that the evidence was so heavily weighed against

- 8 -

the defendant that the prosecution would insist on taking the matter to a trial, where it would easily prevail, and the defendant would face a lengthy prison sentence. The detectives told the defendant that the prosecution wanted to "show this shit off" and that the media would use the word "execute" next to the defendant's picture. The detectives further assured the defendant that they were not lying because they had a reputation to protect. Toward the end of the video, the detectives indicated that the defendant's failure to implicate himself in the detectives' version of events would prevent the defendant from seeing his son, at least until the defendant's son also found himself in prison. Moore also conclusively stated that the defendant was going to jail for first degree murder.

¶ 37    These and other comments from the interviewing officers served only to impermissibly bolster the State's case and inflame the passions of the jury. Because the defendant was adamant that he was not involved in the shooting and did not change his version of events throughout the interview, the final two-thirds of the interview had no probative value. Rather, this portion of the video was highly prejudicial and, at times, removed the finding of guilt from the province of the jury as the detectives conclusively stated that the defendant was guilty of murder. See *Munoz*, 398 Ill. App. 3d at 488-89. Therefore, we find that defense counsel's performance was deficient for not filing a motion to further redact this portion of the video.

¶ 38    In coming to this conclusion, we acknowledge that during an interrogation, the police may use a variety of noncoercive techniques, which include playing on a suspect's ignorance, fears, and anxieties. See *People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2003) (citing *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990)). The instant detectives' interrogation techniques are not at issue in this appeal. Rather, the present issue concerns whether the interview, as shown to the jury, was relevant and not prejudicial. Here, the statements in the final two-thirds of the interview were not relevant, as the defendant did not change his statement or admit to the offenses, and were more prejudicial than probative. As a result, this portion of the video served only to paint the defendant as a "cold-blooded" murderer, bolster the State's case, and disparage the defendant. Only the first one-third of the recording was arguably relevant, as the defendant stated that he was outside Club Apollo at the time of the shooting. However, the trial evidence illustrated that numerous people were outside Club Apollo at the time of the shooting and the surveillance video does not clearly establish the shooter's identity. Moreover, the defendant's presence in a vehicle outside Club Apollo at the time of the shooting does not establish any of the elements of the charged offense.[1] Thus, the inclusion of the final two-thirds of the video prejudiced the outcome of the defendant's trial.

¶ 39    Our finding of prejudice is supported by the totality of the evidence, which failed to directly connect the defendant to the crime. No witness identified the defendant as the shooter, the defendant never admitted to committing the charged offenses, and the physical evidence did not directly connect the defendant to the offense. The maroon coat that the police found in

---

[1]The elements of first degree murder include (1) an individual performed an act that caused a death, (2) without lawful justification, and (3) he intended to kill or do great bodily harm or knew that his acts would cause death or create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1) (West 2010).

The elements of UPWF include (1) an individual possessed on his person, land, or in his abode, a firearm or firearm ammunition and (2) he had previously been convicted of a felony under the laws of Illinois or any other jurisdiction. 720 ILCS 5/24-1.1(a) (West 2010).

the Mitsubishi placed the defendant in a vehicle at the scene; however, the defendant acknowledged during the interrogation that he wore a maroon coat to Club Apollo and he rode in the Mitsubishi. This evidence did not conclusively establish the defendant's guilt, as the surveillance video showed that the shooting suspect was not wearing a coat. Additionally, Lyles's identification of the suspect's vehicle did not establish the defendant's guilt because Lyles's observation is consistent with the defendant's testimony that he was sitting in the black Mitsubishi in the parking lot at the time of the shooting and he left after he heard the gunshots. Lyles's description also was not independently corroborated and did not identify the defendant as the shooter. The only witness identification regarded the defendant's role in an earlier altercation in the restroom of Club Apollo. Finally, the surveillance video does not provide a conclusive identification of the shooter or the allegation that the shooter got into a black Mitsubishi with license plate No. L101306. The surveillance video provides, at best, a general depiction of the scene outside Club Apollo at the time of the shooting. The poor video quality and darkness of the night make any defining features indiscernible. Given this evidence, the defendant's guilt could only be established via inferences from the circumstantial evidence. While proof by inference and circumstantial evidence is sufficient to convict, in this case, the combination of the irrelevant and overly prejudicial portion of the video and the evidence has left us with little confidence in the verdict. See *People v. Wheeler*, 226 Ill. 2d 92, 120 (2007) (criminal conviction may be based solely on circumstantial evidence). We, therefore, find that defense counsel was ineffective in failing to move to redact or otherwise exclude the final two-thirds of the video.

¶ 40    In addition to the defendant's argument that reversal is warranted due to defense counsel's failure to seek redaction of the video, the defendant argues that several other errors are reversible cumulative error. We find that our resolution of the defendant's ineffective assistance claim regarding defense counsel's failure to seek redaction of the video renders analysis of the defendant's remaining contentions of error unnecessary.

¶ 41                                    II. UPWF Conviction

¶ 42    The defendant argues that his UPWF conviction is unconstitutional and must be reversed and that the cause must be remanded for either a new trial on the first degree murder charge or, in the alternative, resentencing. This issue was considered by our supreme court in *People v. McFadden*, 2016 IL 117424, ¶¶ 29-31.[2] While we need not reach this issue, in light of the fact that we are reversing and remanding the cause for a new trial on the first issue, we do so in the interest of judicial economy and fairness to the parties.

¶ 43    The supreme court in *McFadden* stated:

"It is axiomatic that no judgment, including a judgment of conviction, is deemed vacated until a court with reviewing authority has so declared. As with any conviction, a conviction is treated as valid until the judicial process has declared otherwise by direct appeal or collateral attack. Although *Aguilar* may provide a basis for vacating defendant's prior 2002 [aggravated unlawful use of a weapon] conviction, *Aguilar* did not automatically overturn that judgment of conviction. Thus, at the time defendant

_____

[2]We previously held this appeal in abeyance pending the *McFadden* decision, which was subsequently issued on June 16, 2016.

- 10 -

committed the UUW by a felon offense, defendant had a judgment of conviction that had not been vacated and that made it unlawful for him to possess firearms." *Id.* ¶ 31.

¶ 44　　Prior to this appeal, defendant had not independently attained reversal or vacatur of the predicate offense, aggravated unlawful use of a weapon. As a result, defendant's UPWF conviction *would* not be unconstitutional or subject to vacatur on this ground. However, for reasons already discussed in section I of this opinion, we have reversed defendant's UPWF conviction on the independent ground of ineffective assistance of trial counsel.

¶ 45　　　　　　　　　　　　　　　　CONCLUSION

¶ 46　　The judgment of the circuit court of Peoria County is reversed and remanded for a new trial.

¶ 47　　Reversed and remanded.