**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220115-U

Order filed January 9, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0115 Circuit No. 17-CF-1153 |
| JASPER J. JOHNSON, | ) ) ) | Honorable Sarah-Marie Francis Jones, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Albrecht and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  (1) There was sufficient evidence presented to support defendant's first degree murder conviction. (2) Trial counsel provided effective assistance.

¶ 2     Defendant, Jasper J. Johnson, appeals his conviction for first degree murder. Defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt, and (2) trial counsel provided ineffective assistance for failing to move to suppress or object to the admission of a significant portion of his police interview. We affirm.

I. BACKGROUND

¶ 4      On October 4, 2017, the State charged defendant, by superseding indictment, with first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) and two counts of unlawful use of a weapon by a felon (*id.* § 24-1.1(a), (e)). The indictment alleged that defendant, "without lawful justification, shot Kia Johnson with a handgun, knowing such an act created a strong probability of death or great bodily harm," causing her death.

¶ 5      On July 19, 2021, the parties informed the court that they had agreed to many redactions to defendant's approximately 13-hour interrogation video and presented contested redactions to the court. Specifically, the parties agreed to redact references to a specific domestic battery between defendant and Kia, various reports of domestic occurrences from Kia's family members and neighbors, detectives' accusations of abuse, and defendant's prior criminal history and gun use. The parties recorded approximately 35 agreed redactions on a written transcript of the interrogation. The court addressed the parties' contested redactions, including defendant's request to redact additional statements discussing his prior misuse of BB guns resulting, in one instance, in the shooting of Kia; any reference to committing a prior crime against Kia; and defendant's statements regarding going to prison for committing a crime against his "own woman." Defense counsel did not object to statements by defendant following "situations where the detective is engaging in some sort of interrogation techniques to try to get the defendant to try to change his story, and the defendant maintains that it was an accident throughout." The court granted defendant's redaction request regarding defendant going to prison for committing a crime against Kia and denied redactions relating to defendant's use of BB guns, and statement that defendant "never thought this would have went this far. We were just fucking around, I'll leave it like that." The total redactions removed amounted to roughly 22½ minutes from the recorded interview.

Following the redactions, the interrogation video was edited into 13 clips, each approximately one hour long. The cause proceeded to a jury trial.

¶ 6        Samuel Price testified that on June 5, 2017, he was employed as a security officer at an apartment complex. At approximately 8:50 a.m. defendant approached Price and said, "I shot my girl." When Price called 911, he told dispatch that defendant said he "just shot his girl" and defendant "ran off" back into the building. On cross-examination, Price agreed that defendant "seem[ed] stressed out" and described defendant's behavior as "need[ing] some help."

¶ 7        Joliet Detective David Jackson testified that at approximately 9 a.m. on June 5, 2017, he received a report of a shooting and later interviewed defendant. During Jackson's direct examination, the State admitted People's exhibit No. 16, the 13 individual, one hour clips of defendant's interview. The court broke up the viewing of the interview by offering breaks between the clips. Defendant stated that he had been drinking alcohol for the three days preceding the shooting and had smoked marijuana with Kia that morning. Defendant and Kia were standing approximately five to six feet apart. Defendant explained that he was playing with a firearm when he heard a "POW!" and the firearm "went off." Defendant knew there were two bullets in the cylinder located in nonadjacent chambers but did not know their specific location. Defendant denied intentionally aiming and shooting the firearm at Kia and asserted that the shooting was a "freak accident." Initially, defendant thought that Kia was "playing." After shooting Kia, defendant tried to stab his neck with a knife and shoot himself. Defendant used his hands to mimic a stabbing motion. Defendant indicated that the knife was "dull" to explain why he had no marks or other injuries on his neck. Defendant yelled for help and called 911. While on the phone with dispatch, defendant tried to "stab" himself. Defendant also indicated that he drank alcohol and

3

liked to play with firearms. Defendant described one prior incident where he accidentally shot Kia with a BB gun.

¶ 8        Throughout the interview, defendant repeatedly stated that (1) he yelled for help, called 911, and told dispatch that he "just shot [his] girl"; (2) the shooting was an "accident"; (3) defendant was "playing" with the firearm, and did not know that he shot Kia; (4) he "did not want [Kia] to die" and denied being mad at or having an argument with Kia; (5) he attempted suicide following the shooting; (6) he stayed with Kia to ensure she was okay; (7) he asked about Kia's welfare; (8) he loved Kia; and (9) Kia had previously told defendant not to play with firearms.

¶ 9        In the interrogation, Jackson informed defendant that (1) Kia was alive, and stated defendant purposely shot her; (2) witnesses heard defendant and Kia arguing, furniture moving, and defendant say, "drop the knife" before the shooting; and (3) ballistics evidence did not corroborate defendant's version of events, and instead showed that defendant pointed the firearm at Kia. Jackson repeatedly told defendant that he had "no reason to lie" and that he was not trying to "trick" defendant. Jackson accused defendant of "lying" and challenged defendant's version that the shooting was an accident. Specifically, Jackson accused defendant of "whooping" Kia, being a "cold-blooded murderer," "murder[ing]" Kia, making a "conscious decision to pull the trigger," "plann[ing]" to murder Kia, "point[ing] the gun at [Kia]," and "put[ting] the gun to [Kia's] head." When detectives exited the interview room, defendant continued talking and spoke in "soliloquies." During these speeches, defendant professed that the shooting was an accident and expressed regret for playing with the firearm and killing Kia. Defendant indicated that he loved Kia. Following the publication of the videos, Jackson testified he did not observe any marks,

puncture wounds, or injuries on defendant's neck consistent with stabbing himself with a knife. The State admitted photographs of defendant that corroborated Jackson's observations.

¶ 10    On cross-examination, counsel questioned Jackson regarding his characterization that the conversation with defendant was an interview instead of an interrogation. Eventually, Jackson acknowledged that, in an interrogation he "aggressively" investigated a "particular set of facts." At the start of the interrogation, Jackson assured defendant that he was "there to help" that Jackson would not "lie" to or "trick" defendant. Jackson denied becoming argumentative with defendant but conceded that he "had to match [his] intensity to [defendant's] intensity." When counsel asked whether Jackson considered calling, "somebody a liar repeatedly and telling him that he is lying and has been lying all day" was argumentative, Jackson responded that it could be. Jackson conceded that at times during the interview he could have been belligerent and hostile toward defendant but could not answer whether he had been disrespectful. Eventually, Jackson admitted to lying to defendant but adamantly refused to categorize certain statements, such as telling defendant Kia was alive and said that defendant shot her, as fabricated evidence. Jackson indicated that many questions were unsupported by evidence and sought to elicit a particular response from defendant. Specifically, there was no evidence that (1) defendant "intentionally put the gun to [Kia's] head," (2) Kia pulled a knife on defendant, (3) defendant and Kia were arguing or that the furniture had been moved before the shooting, and (4) Kia had been beaten. Counsel asked numerous questions of Jackson regarding the lack of evidence for Jackson's conclusion that defendant's purposefully shot Kia. Counsel highlighted that defendant never admitted to "point[ing] the gun at Kia, knowing that he was pointing the gun at Kia, and *** pull[ing] the trigger," and claimed to have never fired the firearm before shooting Kia.

5

¶ 11    Jackson found no evidence of premeditation or motive to murder Kia on defendant's cellular phone. Jackson believed that defendant's mental health diagnoses were unimportant and unrelated to determining what happened to Kia. Defendant maintained that he was playing with the firearm by "spinning the cylinder," "cocking the hammer," and "pulling the trigger" when the firearm "went off." Defendant consistently stated that the shooting was an accident beginning with his first communication with Price through the end of the interview. Jackson stated that in the first four to five hours of the interrogation, defendant had no shirt until someone provided him a blanket. During the entirety of the interrogation defendant did not have shoes, was only provided a single bag of chips for food and was not permitted to call his grandmother after repeated requests.

¶ 12    Justin Barr, a forensic scientist, testified that he examined the firearm that defendant fired. Barr identified the firearm as a revolver with a rotating six-chambered cylinder, a "half notch safety," and a "rebound safety." Both safeties were intended to prevent an "accidental[ ] or unintentional[ ]" firing and were properly working. Following a test fire, Barr determined that the firearm operated, in that to discharge, "the trigger ha[d] to be pulled." The firearm had both a single-action and double-action trigger. The single-action trigger required a pull weight of 5½ to 6 pounds. The double-action trigger required a pull weight of 13 to 13½ pounds. On cross-examination, Barr stated that he could not say that the weapon "couldn't misfire in the future or in the past[.]"

¶ 13    The parties stipulated that, during Kia's autopsy, bullet fragments were removed from her temple, scalp, and brain. The parties also stipulated that a forensic examination of defendant's cell phone and dispatch records showed that defendant did not call or otherwise communicate with 911 on June 5, 2017.

¶ 14        Dr. Michael Humilier, a forensic pathologist, testified that he performed Kia's autopsy and determined that Kia died of a gunshot wound to her head. Humilier observed gunshot wound stippling around the wound, indicating that the bullet was fired from within 18 to 24 inches from Johnson. Also, Humilier determined that Kia had used marijuana prior to her death. On cross-examination, Humilier stated that "[t]he appearance of the stippling looks as if the gun [was] pointed from behind toward the left side of her head ***." Humilier observed no other injuries, defensive wounds, or evidence to indicate that Kia had been involved in a fight or been beaten.

¶ 15        In closing argument, defense counsel asserted that while defendant was responsible for Kia's death, the jury must determine defendant's criminal culpability. Specifically, counsel argued that the State failed to prove that defendant "knowingly pointed the gun at Kia, knowingly pulled the trigger, and did so intentionally[.]" Counsel supported this position by identifying defendant's statements from his interview that he did not know Kia was shot, where Kia was located when the gun went off, did not "deliberately point" the firearm at Kia, "did not intend to shoot" Kia, and was not "purposely holding the gun." Defendant saw Kia on the floor and thought she was "playing." Counsel argued that "[i]n 13 hours, [defendant] did not change his story. No matter what Detective Jackson tried to do." Counsel also highlighted that defendant never said that he "pointed that gun at [Kia]," or "wanted the gun to go off" at any point during the interview. Counsel argued that nothing defendant said regarding "what happened that day reflect[ed] either the spirit of malice or an expression of an intentional, deliberate act. It was *** carelessness." Counsel repeatedly referenced defendant's unwavering assertions that the shooting was unintentional, despite the questionable tactics that Jackson used to question defendant.

¶ 16        The court provided the jury instructions for first degree murder and the lesser included offense of involuntary manslaughter. The court also instructed the jury that only they are "the

7

judges of the believability of the witnesses and of the weight to be given to the testimony of each of them." The jury found defendant guilty of first degree murder and two counts of unlawful use of a weapon by a felon. The court denied defendant's motion for a new trial and imposed a sentence of 48 years' imprisonment. Defendant appeals.

¶ 17                                    II. ANALYSIS

¶ 18                          A. Sufficiency of the Evidence

¶ 19        Defendant first argues on appeal that the State failed to prove him guilty beyond a reasonable doubt, where it failed to prove that defendant "knowingly aimed" the firearm at Kia and "knowingly pulled the trigger." In assessing the sufficiency of the evidence, we must determine whether the evidence, when viewed in the light most favorable to the State, would permit any rational trier of fact to find that the State proved the elements of the offense beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). "[I]t is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." *People v. Akis*, 63 Ill. 2d 296, 298 (1976). We will not retry a defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. Additionally, "the trier of fact is free to believe part of one's testimony without believing all of it." *People v. Spaulding*, 68 Ill. App. 3d 663, 675 (1979).

¶ 20        To prove defendant guilty of first degree murder, the State needed to prove that defendant (1) "perform[ed] acts which caus[ed] the death" of Kia, and (2) "kn[ew] that such acts create[ed] a strong probability of death or great bodily harm to" Kia. See Illinois Pattern Jury Instructions,

8

Criminal, No. 7.01 (approved Jan. 30, 2015) (hereinafter IPI Criminal No. 7.01); 720 ILCS 5/9-1(a)(2) (West 2016). Here, defendant does not dispute that he caused Kia's death or possessed a weapon unlawfully. Therefore, we will only address the element disputed by defendant—that he *intentionally* caused Kia's death.

¶ 21    When viewing the evidence in the light most favorable to the State, and drawing all reasonable inferences, we cannot say that the State failed to meet its burden of proof. Specifically, the State proved that defendant knew that the firearm contained two bullets, that he "play[ed]" with the firearm by spinning the cylinder, cocking the hammer, and pulling the trigger, knowing that Kia was near him. The firearm was within 18 to 24 inches of Kia's head when it was discharged. Together, this evidence established that defendant used a firearm in a manner that caused the death of Kia, knowing that "such acts create[d] a strong probability of death or great bodily harm to" Kia. See IPI Criminal No. 7.01; 720 ILCS 5/9-1 (a)(2) (West 2016).

¶ 22    In light of the evidence that directly rebutted defendant's version of events, including that defendant did not know where Kia was located while the gunshot stippling evidence showed that they were in close proximity; both triggers required weight to be used to discharge the firearm; the two safety mechanisms on the firearm were properly working therefore making a misfire unlikely; photographs showed no marks or injuries where defendant stated he had attempted to stab himself with a knife; and there was no record of defendant calling 911 when he claimed to have spoken to dispatch, the jury was not persuaded by the consistency with which defendant claimed that the shooting was an accident and was entitled to reject the defense. See *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004) (a trier of fact is free to accept as much or as little as it pleases of a witness's testimony); see also *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (a trier of fact is not required to search out all possible explanations consistent with innocence and raise those explanations to a

9

level of reasonable doubt). Given the totality of these facts, we find the State proved defendant's guilt of first degree murder beyond a reasonable doubt.

¶ 23                                B. Ineffective Assistance of Counsel

¶ 24        Defendant contends that trial counsel provided ineffective assistance for failing to move to suppress or object to the admission of a significant portion of his police interrogation. Specifically, defendant asserts that the video, which included deceptive interview techniques, was "repeated so consistently as to impermissibly bolster the State's case."

¶ 25        To establish ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudiced defendant's case. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Under the first prong, the reviewing court must give deference to counsel's conduct within the context of the trial and without the benefit of hindsight. *People v. King*, 316 Ill. App. 3d 901, 913 (2000). As such, defendant must overcome a strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Under the second prong, defendant must show that, but for counsel's deficient representation, there is a reasonable probability that the result of the proceedings would have been different. *Id.* at 149. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Each case involving a videotaped interrogation must be decided on its own facts while viewing the statements of both the police and defendant in the context of the entire video and against the evidence offered at trial. See *People v. Dunbar*, 2018 IL App (3d) 150674, ¶¶ 52-54; see also *People v. Hardimon*, 2017 IL App (3d) 120772, ¶¶ 34-39.

¶ 26        Here, defendant cannot establish that trial counsel provided deficient representation for failing to move to limit or object to the majority, or all, of the interrogation. Initially, we note that

10

the majority of redactions were by agreement of the parties, which limited the references to defendant's prior criminal history, prior domestic occurrences between defendant and Kia, as reported by defendant and Kia through police reports and speaking to Kia's family members and neighbors. Additionally, counsel moved to redact several additional portions of the video, including statements from defendant and Jackson. Regarding the remainder of the interview, counsel argued that defendant maintained that it was an accident despite Jackson's relentless efforts that included lies and deception. During pretrial motions, counsel asserted his intention to admit instances of defendant's interview where Jackson exhibited aggressive interrogation techniques and defendant maintained his story. Then, counsel cross-examined Jackson in a manner consistent with this theme, where he highlighted Jackson's aggressive and deceptive interrogation techniques and the lack of evidence supporting the conclusion that defendant premeditated the murder or shot Kia purposefully.

¶ 27       Additionally, counsel elicited testimony portraying Jackson in an unfavorable light, where Jackson appeared evasive and unwilling to answer counsel's questions, Jackson indicated that he believed defendant's mental health diagnoses were unimportant, and Jackson provided defendant with limited resources during the entirety of the interrogation. In closing argument, counsel used the length of the interview and Jackson's aggressive techniques in support of his defense that the shooting was accidental. The scope of the interrogation was an integral piece of counsel's trial strategy to support the defense that the shooting was an accident, and thus, the State could not prove that defendant intentionally caused Kia's death. Thus, in this case, showing the video capturing the interactions between Jackson and defendant, and the questions posed by Jackson gave context to defendant's repeated explanation for the murder. See *Dunbar*, 2018 IL App (3d) 150674, ¶¶ 52-54; *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56 (Police officer's opinions

11

and observations regarding defendant's guilt during an investigation are generally admissible for their "effects on the defendant, to provide context to the defendant's responses, or to explain the logic and course of the officers' interview or investigation."). In light of defendant's admission to shooting Kia, we find that counsel's decision regarding the extent with which to present defendant's interview was one of sound trial strategy and objectively reasonable. See *King*, 316 Ill. App. 3d at 913; see also *Houston*, 226 Ill. 2d at 144. Because defendant cannot establish deficient performance, his ineffective assistance of counsel claim must fail. *Strickland*, 466 U.S. at 694.

¶ 28 In coming to this conclusion, we reject defendant's attempt to analogize this case to *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 36-37. In *Hardimon*, we found that a portion of defendant's interview was highly prejudicial and impermissibly bolstered the State's case. *Hardimon*, 2017 IL App (3d) 120772, ¶ 37. We specifically took issue with the statements that included detectives accusing defendant of being the perpetrator and defendant repeatedly denying those accusations, detectives "goad[ing]" defendant to confess, exaggerating evidence against defendant, indicating that defendant faced a lengthy prison sentence, and insisting that they were not "lying." *Id.* ¶ 36. As a result, we found counsel ineffective for failing to move to redact *any* portion of the video. *Id.* ¶ 37. In contrast, here, counsel exhibited clear trial strategy in the portions of defendant's interview that he moved to redact and admit. S*upra* ¶¶ 26-27. In the admitted portions, counsel highlighted Jackson's aggressive interview techniques and questionable treatment of defendant as well as the persistence of defendant's story. *Supra* ¶¶ 26-27. Moreover, Jackson explained that many of the questions posed to defendant were unsupported by evidence and asked to elicit a particular response. *Supra* ¶ 10; see *People v. Melock*, 149 Ill. 2d 423, 450 (1992) (a confession obtained by deception does not invalidate a confession as a matter of law). In

12

light of the evidence presented in this case, counsel's evident trial strategy, and the court's instruction that the jury is responsible for determining the credibility of witnesses and are presumed to have followed that instruction, we find the present case distinguishable. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 49 ("Jurors are presumed to follow the instructions provided by the trial court.").

¶ 29                                    III. CONCLUSION

¶ 30        The judgment of the circuit court of Will County is affirmed.

¶ 31        Affirmed.