# Illinois Official Reports

## Appellate Court

---

### *People v. McCallum*, 2019 IL App (5th) 160279

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RANDY McCALLUM, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-16-0279 |
| Filed | December 6, 2019 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 09-CF-1442; the Hon. John Baricevic and the Hon. Heinz M. Rudolf, Judges, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Jacqueline L. Bullard, and John M. McCarthy, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Patrick Delfino, Patrick D. Daly, and Max C. Miller, Special Prosecutors, of State's Attorneys Appellate Prosecutor's Office, of Mt. Vernon, for the People. |
| Panel | JUSTICE OVERSTREET delivered the judgment of the court, with opinion.<br>Justices Barberis and Boie concurred in the judgment and opinion. |

¶ 1    In February 2016, a St. Clair County jury found the defendant, Randy McCallum, guilty of two counts of first degree murder for the September 2009 shooting deaths of Charles Black and Kevin McVay. Viewed in the light most favorable to the State, the evidence at trial established that the defendant killed Black and McVay in front of his ex-girlfriend's house and dropped a cigarette butt at the crime scene, that an eyewitness to the murders identified the defendant as the shooter, and that, in a dying declaration, Black also identified the defendant as the shooter. The evidence further established that the defendant made false exculpatory statements when questioned about the murders and made additional statements demonstrating his consciousness of guilt during a subsequent telephone conversation with his mother and sister. With respect to the former, the jury was shown redacted video recordings of two postarrest interviews that the defendant gave to investigators from the Illinois State Police. On appeal, arguing that he should be granted a new trial, the defendant contends that the circuit court abused its discretion in denying his pretrial motion to prohibit the State's introduction of the redacted recording of the second interview. For the reasons that follow, we disagree and affirm the defendant's convictions.

¶ 2                                          BACKGROUND

¶ 3    In September 2009, the defendant's sister, Rachelle McCallum, was dating the defendant's friend, Devion Kidd, and the defendant, who lived in Fairview Heights, was or had recently been dating Tatanisha Banks. Tatanisha lived in a house on the 1100 block of North 48th Street in Washington Park with her sisters Taquela and Tierra Banks. The defendant helped the Banks sisters move into the house in August 2009.

¶ 4    On the morning of September 17, 2009, the defendant was at the Banks sisters' house visiting Tatanisha. On September 18, 2009, Tierra and Tatanisha went out with friends around midnight and returned home around 3 a.m. Sometime thereafter, Black and McVay drove to the sisters' house in Black's car, which Black parked on the street in front of the house. Taquela was not home that night.

¶ 5    At approximately 4:35 a.m., Black called 911 reporting that he had just been shot on 48th Street and that "Randy McCallum" was "the shooter." On the recording of the 911 call, it is clear that Black was experiencing difficulties breathing and communicating. Black can be heard pleading with "Randy" following the sound of multiple gunshots. Black's brief call abruptly ends after the firing of additional gunshots and his apparent death rattle are heard.

¶ 6    When the police who responded to Black's 911 call arrived at the Banks sisters' house, they found McVay's body in the ditch by the street near Black's car. Approximately 30 feet away, Black's body was on the ground in the front yard next to a tree, with the cell phone that he used to call 911 still in his hand.

¶ 7    An autopsy later revealed that McVay had been shot three times in the lower abdomen and once in the head. The headshot proved fatal and resulted in a wound that was consistent with a contact wound. An autopsy revealed that Black had also been shot numerous times about the body and had also died from a gunshot wound to the head.

¶ 8    Fired bullets recovered by the pathologist who performed the autopsies were consistent with 9-millimeter bullets, and 9-millimeter cartridge casings, all of which had been ejected

from the same handgun, were found at the crime scene. A fully loaded .30-30 Winchester rifle with no fingerprints on it was found on the ground along the fence of a sewage pump station adjacent to the Banks sisters' front yard. A vehicle repair estimate for Kidd's vehicle dated September 2, 2009, was found in the ditch near McVay's body. Additionally, a cigarette butt with the defendant's DNA on it was discovered on the street near Black's car. The crime scene investigator who collected the cigarette butt later testified that it "appeared to be fresh," explaining that "it still ha[d] the gray ash on the end of [it]."

¶ 9     Tierra witnessed part of the incident from her bedroom window, which overlooked the front yard of the house. When interviewed by investigators on September 18, 2009, Tierra gave two video-recorded statements regarding what she had seen and heard. In her first statement, Tierra indicated that she had heard arguing outside her window and had heard a man, whose voice she did not know, repeatedly say, "It's me, bro." When she looked out, she saw a man, whom she could not identify, shoot a man who was on the ground by the tree in her front yard. In her second September 18, 2009, video-recorded statement, Tierra identified the defendant as the man who she had heard talking and had seen shooting outside her bedroom window.

¶ 10     On the night of December 8, 2009, the defendant was arrested at a home in Lebanon. On December 9, 2009, the defendant waived his *Miranda* rights and was twice interviewed at the St. Clair County jail by Special Agents James Walker and Robert O'Brien of the Illinois State Police. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Both interviews were video recorded, and redacted copies of both recordings were presented at trial. As redacted, the recording of the first interview was approximately 35 minutes long, and the recording of the second was approximately 18 minutes long. The record indicates that transcripts of the interviews were never prepared.

¶ 11     During the first video-recorded interview, which commenced at approximately 3:40 p.m., the defendant denied the investigators' suggestions that he had been hiding out in Lebanon and Alorton. He acknowledged, however, that he was aware that the investigators had been wanting to talk to him, that he had only known the resident of the home where he had been arrested for "a couple of months," and that he had met the resident through Robert Jones. Additionally, the defendant did not deny the investigators' suggestions that he had narrowly avoided being arrested at a club in East St. Louis and that he had not previously been arrested in Alorton because his father had significant "pull" with the Alorton Police Department. The defendant laughed and joked with the investigators about his near arrest at the club, and he advised them that he was going to contact them after his upcoming birthday. The defendant further advised that he did not have a driver's license.

¶ 12     When asked if he knew Black and McVay, the defendant paused before stating that he did. The defendant also smiled when stating that he knew Black. Referring to Black and McVay as his "partners," the defendant acknowledged that he knew that they had been murdered. When Walker advised the defendant that people were claiming that he had killed Black and McVay, the defendant claimed that he knew nothing about the killings. The defendant further claimed that he could not recall where he had been on the morning in question. The defendant acknowledged that he, Black, and McVay had been "close" and had grown up together.

¶ 13     When asked about Tatanisha, the defendant indicated that he used to see her, but he had not been to her house in Washington Park since helping her move in August 2009. When the defendant was advised that Tatanisha and Taquela had both claimed that he had been at their house several times since then, the defendant indicated that he did not remember being there.

¶ 14    When Walker falsely claimed that Kidd and Jones had both implicated the defendant in the murders, the defendant indicated that he had no idea why they would do that because he had not done anything. When Walker asked the defendant if he was going to confess to the murders, the defendant laughed and again claimed no knowledge of what had occurred. He also insisted that Black and McVay were his "partners." Thereafter, O'Brien asked Walker if they were going to let the defendant know about the "secret," *i.e.*, "the phone call." When the defendant asked about the phone call, Walker indicated that he was not yet ready to discuss it.

¶ 15    After advising the defendant that the investigation had led the police to conclude that the defendant, Kidd, and Jones were involved in the murders and that the defendant was the shooter, Walker again asked the defendant if he was willing to confess. In response, the defendant again laughed and insisted that he could not recall where he had been on the morning in question.

¶ 16    When the defendant was confronted with the fact that he did not act as if he cared that his friends had been killed, the defendant indicated that he felt bad for them but had not murdered them and had not learned of their deaths until days after the fact. The defendant further indicated that he lost friends all the time. When the defendant was asked where he had been when he first learned that Black and McVay had been murdered, he advised that he could not recall, but he might have been at a friend's house. When O'Brien asked the defendant why the defendant had smiled when Walker first mentioned Black's name, the defendant stated that he had to "think about the name." The defendant also indicated that he smiled because he knew that Walker was going to accuse him of having committed the murders.

¶ 17    When the defendant was asked if he could assist in the investigation by providing an alibi that the investigators could verify, he indicated that he had probably been at a hotel with a girl when the murders occurred. When asked which hotel, the defendant stated that he had "probably" been at a hotel.

¶ 18    At one point, while reading from a notepad, Walker falsely claimed that Jones had specifically stated, "[The defendant] told me he killed them two. [The defendant] told me he wasn't worried about it." In response, the defendant laughed and indicated that if Jones did make such statements, Jones was talking "crazy." The defendant also laughed in disbelief when Walker again falsely claimed that Kidd had been cooperating as well.

¶ 19    Toward the end of the first interview, the investigators reiterated that they had a secret, and they advised the defendant that their secret constituted evidence of his guilt. Walker then asked the defendant if he would be willing to confess if he was shown the evidence of his guilt. In response, the defendant denied that such evidence existed and explained that regardless of what the investigators showed him, he would not confess to something he did not do. The defendant agreed to speak with Walker and O'Brien at a later time, and he was told to think about where he might have been when the murders occurred.

¶ 20    We note that on the unredacted recording of the first interview, the defendant was questioned about a string of robberies that had recently occurred in Lebanon and about drugs and ammunition that had been found in the home where he was arrested. The defendant also acknowledged that he had recently violated the conditions of his parole and knew that there was a resulting warrant out for his arrest. The defendant claimed that when he was arrested in Lebanon, he had been "on the run" because of the warrant.

¶ 21    The defendant's second video-recorded interview with Walker and O'Brien commenced approximately two hours after the conclusion of the first. After the defendant again waived his

*Miranda* rights, Walker referenced the secret that had previously been mentioned and advised the defendant that there was an exception to the old saying, "Dead men tell no tales." Walker then played the recording of Black's 911 call, while the defendant sat silently at the interview table with his head down on his arms. At the conclusion of Black's call, Walker asked the defendant if it sounded familiar. In response, the defendant raised his head and indicated that it did not. When Walker advised the defendant that Black had placed the 911 call after the defendant had shot him "the first time," the defendant denied shooting Black, stating that the call was "bulls***." When the defendant was asked why Black had identified him as the shooter, the defendant initially denied that Black had done so. The defendant then acknowledged that Black had stated his name but again insisted that the call was "bulls***." When asked why Black would have claimed that the defendant had shot him, the defendant persisted that the call was "bulls***" and suggested that Black was confused. When the investigators offered to play the recording a second time, the defendant stated that he did not need to hear it again.

¶ 22    Walker subsequently commented that the 911 recording of Black being fatally shot and identifying the defendant as the shooter was "powerful evidence" that the defendant could not overcome. Walker further advised that he had spoken to witnesses who had placed the defendant at the scene of the murders. The defendant suggested that Walker's claims were "bulls***" and that Black's 911 call could not place him at the scene of a crime he did not commit. In response, Walker advised that Black had placed the defendant at the scene and had clearly identified him as the shooter. Walker emphasized that of all the people Black could have named, Black had named the defendant. When O'Brien reiterated that other people had also placed the defendant at the scene, the defendant indicated that those people did not know what they were talking about. When the defendant suggested that the 911 call was not evidence against him, Walker explained that "legally" it was evidence, and the defendant's attorney would have to recognize it as such. The defendant argued that Black did not know who shot him and could have named anyone.

¶ 23    After Walker subsequently advised the defendant that his inability to recall his whereabouts at the time of the murders was not a defense, the defendant indicated that he might have been at a friend's house when the killings occurred. The investigators again stressed the compelling nature of Black's 911 call, advising the defendant that dying people do not generally make false accusations or random identifications. Again stating that there were eyewitnesses who corroborated Black's call, Walker encouraged the defendant to tell the truth about what had happened. Walker asserted that he knew that the defendant had shot and killed Black and McVay but could only speculate as to why. When the defendant asked Walker, "How do you know I did it," Walker again used his notepad to falsely suggest that Jones had specifically stated, "[The defendant] told me he killed them two. [The defendant] told me he wasn't worried about it." In response, the defendant again denied killing the men and indicated that what Jones had claimed was "bulls***."

¶ 24    When subsequently discussing the defendant's apparent lack of remorse over the loss of his friends, O'Brien again noted that the defendant had smiled when Black's name was first mentioned. O'Brien further noted that the defendant had laughed at times when Black's name was subsequently mentioned. O'Brien asked the defendant if the defendant thought "this [was] funny." In response, the defendant indicated that he had smiled and laughed because he was being accused of killing "some motherf***" that he did not kill. The second December 9, 2009,

- 5 -

interview concluded with the defendant again stating that he did not murder anyone. Notably, during the second interview, the defendant's tone and demeanor were markedly more serious than they were during the first.

¶ 25    We note that on the unredacted recording of the second interview, Walker extensively discussed the "dying declaration" exception to the hearsay rule and opined as to how a jury would perceive Black's 911 call. Walker further suggested that in the absence of an alibi defense that the defendant's attorney could assert on the defendant's behalf Black's dying declaration would legally be taken "as fact" and the jury would view the defendant's bare denials as "bulls***." The unredacted recording of the second interview concluded with the defendant requesting his attorney and stating, "Let's go to court."

¶ 26    On December 11, 2009, Tierra gave a third video-recorded statement to investigators. In her third statement, she again identified the defendant as the man she had heard and seen outside her window, and she again advised that she had seen the defendant shoot the man by the tree.

¶ 27    On December 14, 2009, the State charged the defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)). The charges alleged that the defendant shot and killed Black and McVay on September 18, 2009, with the intent to kill or do great bodily harm.

¶ 28    In February 2013, after Tierra agreed to write an apology to the defendant and his family for implicating him in her statements to the police, a relative of the defendant's, whom Tierra knew as "Jaymo," contacted her via Facebook and asked her to memorialize the apology in an affidavit. Tierra agreed and met Jaymo across the street from the East St. Louis Public Library, where he presented her with an affidavit form on which to copy the apology she had written. After the affidavit was prepared and notarized, Tierra gave it back to Jaymo. In the affidavit, Tierra apologized for saying that the defendant was the shooter, explaining that she had done so out of fear and intimidation after the police had threatened her.

¶ 29    On September 9, 2013, the cause proceeded to a jury trial that ultimately resulted in a mistrial. The record indicates that the mistrial resulted from a holdout juror, who was later the focus of a resulting investigation. The record further indicates that as part of that investigation, audio recordings of the telephone calls that the defendant made from the St. Clair County jail during his first trial were reviewed by the St. Clair County Sheriff's Department.

¶ 30    On the evening of September 10, 2013, while the defendant was incarcerated in the St. Clair County jail during his first trial, he called his mother, Gwendolyn McCallum. The defendant placed the call using the jail's inmate telephone system, which records all calls. During his recorded conversation with Gwendolyn, the defendant explained that he was considering testifying that he shot McVay and Black in self-defense after they threatened him over money that he owed them. Referencing the rifle found along the fence by the sewage pump station, the defendant explained that he could claim that after Black and McVay retrieved the rifle from the trunk of Black's car, they had used it to try to "walk [the defendant] in[to] the house." The defendant suggested that he could thus claim that Black had not called 911 until after the defendant had gotten "the upper hand" in the situation. The defendant indicated that he could tell the jurors that he "did what [he] had to do" under the circumstances. In response, Gwendolyn reminded the defendant that he only needed one of the jurors to believe that he was not guilty.

¶ 31    Rachelle subsequently joined the conversation and repeatedly advised the defendant to not testify or admit to anything. Rachelle also reminded the defendant that he only needed one

person to believe he was not guilty. Rachelle then repeatedly assured the defendant that not all of the jurors believed that he was guilty. Rachelle told the defendant that he needed to pay attention to the jury and to think "long and hard" about that "one person." Rachelle told the defendant that he was "good." The defendant indicated that he understood what Rachelle was saying. Rachelle then told the defendant that since he had not done anything, he should not admit to anything. The defendant agreed that he had not done anything, but he explained that he was "trying to win." Rachelle again assured the defendant that not all of the jurors believed that he was guilty and again advised him to pay attention to the jury. The conversation then turned to family matters, and Rachelle told the defendant to call back later because Kidd wanted to talk to him.

¶ 32       In February 2016, the cause proceeded to a second jury trial. Prior to trial, the defendant filed numerous motions, one of which was a motion *in limine* requesting that the State be precluded from introducing the video recordings of his two postarrest interviews. The defendant noted that the recording of the first interview included references to the defendant's prior criminal history and to cocaine, ammunition, and robberies that were unrelated to the present case. With respect to the recording of the second interview, the defendant suggested that it primarily consisted of Walker's legal opinions, which included Walker's observations as to what a "jury will think if [the defendant] does not come up with a defense." Noting that the defendant had denied the investigators' accusations throughout both interviews, the defendant described the recordings as "exculpatory."

¶ 33       At the hearing on the defendant's motion *in limine*, the defendant reiterated his previous objections to the recording of the first interview and complained that, during the second interview, Walker went "on and on and on" about his opinions of the case. Counsel argued that introducing the recording of the second interview would serve no purpose other than to allow Walker to essentially "give a closing argument" during trial. In response, the State indicated that it had already redacted counsel's objected-to references from the recording of the defendant's first interview. With respect to the recording of the second interview, the State explained that it wanted to further review the recording and possibly work with defense counsel to determine what redactions might be appropriate. Chief Circuit Court Judge John Baricevic, who had presided over the defendant's case since its inception, took the defendant's motion under advisement, pending the parties' attempt to negotiate an agreement on the matter.

¶ 34       At the commencement of the defendant's second trial, Judge Baricevic noted that the defendant's motion *in limine* was still pending. Defense counsel advised the court that the parties had not reached an agreement with respect to the second recording and that the defendant was standing on his previous argument that neither of the recordings should be admitted. Counsel emphasized that the defendant had not confessed to the murders during either interview. In response, the State argued, *inter alia*, that the redacted recording of the first interview included statements that reflected the defendant's consciousness of guilt and that the recording of the second interview was relevant because it included the defendant's reactions and demeanor when confronted with the recording of Black's 911 call. The State also indicated that in light of the defendant's previously stated concerns, it had edited the recording of the second interview by eliminating Walker's extensive discussions regarding the strength of Black's "dying declaration" and how a jury would view it.

¶ 35       Judge Baricevic subsequently advised the parties that the Honorable Heinz Rudolf would be presiding over the defendant's trial. Because Judge Baricevic had previously taken the

defendant's motion *in limine* under advisement, however, it was agreed that Judge Baricevic would rule on the motion after viewing the redacted recordings of the interviews during jury selection. Thereafter, Judge Baricevic viewed the redacted recordings and entered a written order finding that they were admissible in that they were probative and did not have a high potential for prejudice.

¶ 36    In its opening statement to the jury, the State primarily discussed the recording of Black's 911 call and its specific contents. The State advised the jurors that they would hear the defendant shooting Black and McVay and would further hear Black identify the defendant as the shooter before dying. The State further advised that when Black's body was discovered, the cell phone that he used to place the 911 call was "still clenched in his right hand." The State emphasized that the forensic evidence from the crime scene included a cigarette butt with the defendant's DNA on it. The State did not discuss Tierra, the defendant's postarrest interviews, or the recorded conversation that the defendant made from the St. Clair County jail on September 10, 2013.

¶ 37    Defense counsel urged the jurors to carefully analyze the State's evidence because unanswered questions about the murders remained despite "the 911 tape." With respect to the cigarette butt found at the crime scene, counsel advised the jurors that the defendant used to frequent the Banks sisters' house and may have been there earlier on the day of the murders. Counsel also noted that while Tierra's name would likely come up during the trial, she had given several inconsistent statements over the years.

¶ 38    The recording of Black's 911 call was admitted and played for the jury on the first day of the defendant's four-day trial. On the second day, the State presented forensic evidence, Tierra and Walker testified, and the jury viewed the redacted video recordings of the defendant's two postarrest interviews. On the third day, the State presented additional forensic evidence and the recorded conversation that the defendant had with Gwendolyn and Rachelle on September 10, 2013, was admitted and published through the testimony of Sergeant Steven Strubberg of the St. Clair County Sheriff's Department. As the sole witness for the defense, Gwendolyn also testified on the third day of trial. On the fourth and final day, the parties gave their closing arguments, and the jury returned its verdict finding the defendant guilty on both counts.

¶ 39    When Tierra testified, she indicated that the defendant had frequently visited her home in the weeks prior to the murders because he and Tatanisha were "still close" at the time. Tierra testified that the defendant was at the house when she left for work on September 17, 2009, at 11 a.m. Tierra stated that she had grown up with Kidd and Jones but had not known Black or McVay. Tierra indicated that the rifle found along the fence of the pump station had previously been inside her home but that she had not seen it since August 2009.

¶ 40    On September 18, 2009, Tierra and Tatanisha went "riding around" with some friends around midnight and returned home around 3 a.m. After returning, Tierra retired to her bedroom at the front of the house and went to sleep. She was later awoken by the sounds of arguing outside, and she heard the defendant say, "It's me, [b]ro," three or four times. She then heard multiple gunshots, all of which sounded the same. Tierra testified that when she subsequently looked out her bedroom window, she saw two men on the ground in the front yard, one by the ditch and one by a tree. She also saw two men standing in the yard, one of whom was standing by the man on the ground by the tree. She then saw the man standing near the tree shoot the man on the ground by the tree. Thereafter, a gold vehicle that looked like Kidd's and had been parked on the street near Black's car "pulled off" and drove away. Tierra

testified that she could not identify either of the two men that had been standing in her yard but that the defendant was "[p]ossibly" the man who had shot the man on the ground by the tree. Tierra further testified that she was positive she had heard the defendant's voice outside her window, but she also indicated that she was not certain that she had.

¶ 41 Tierra acknowledged that in her first video-recorded September 18, 2009, interview with the police, she had claimed that she could not identify the man who had been standing near the tree or the voice that she had heard outside her window. She further acknowledged that in her second video-recorded September 18, 2009, interview and in a third video-recorded interview that she gave on December 11, 2009, she had stated that she had heard the defendant say, "It's me, [b]ro," and had also seen the defendant shoot the man on the ground by the tree.

¶ 42 With respect to the threats that she referenced in her February 2013 affidavit apologizing to the defendant and his family, Tierra indicated that although she had not been physically threatened by the police, she had feared that she "was going to go to jail or something" if she did not implicate the defendant. She explained that when she was first interviewed, the police had repeatedly accused her of lying and had threatened to charge her for it. Tierra testified that no one had forced or threatened her into preparing her February 2013 affidavit. The jury was later instructed that it could consider Tierra's prior inconsistent statements as substantive evidence. See Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014); *People v. Patterson*, 2017 IL App (3d) 150062, ¶ 27.

¶ 43 Walker testified that he made several false statements to the defendant during the two video-recorded interviews that were conducted on December 9, 2009. Walker acknowledged that he had lied when claiming that Jones and Kidd had implicated the defendant in the murders and had lied when suggesting that Jones had made the statements that Walker read from his notepad. Walker explained that lying to the subject of an interview was "a common interrogation technique" used to evaluate the subject's responses and reactions. When cross-examined, Walker acknowledged that during both interviews, the defendant's responses "pretty much were, 'I wasn't there,' 'I didn't do it,' 'It's bulls***,' something in those contexts."

¶ 44 Strubberg testified that inmates at the St. Clair County jail are generally allowed to make outgoing calls using jail-operated telephones from after breakfast until 10 p.m. All such calls are recorded and stored in an off-site system, and a message advising that the calls are recorded is heard at the commencement of every call. Strubberg explained that when placing an outgoing call from the jail, an inmate must use two specifically assigned identification numbers. Strubberg further explained that although it is a violation of jail policy for an inmate to use another inmate's identification numbers, the numbers were sometimes stolen, sold, or traded.

¶ 45 Strubberg testified that the call the defendant made to Gwendolyn and Rachelle on the evening of September 10, 2013, had been placed using another inmate's identification numbers. Strubberg further testified that when the call was made, the defendant had been housed in a unit of the jail with restricted one-hour phone-use times. Strubberg identified the defendant's voice on the recording of the call, stating that he was familiar with the defendant's voice and was positive that the male voice on the recording was his. When cross-examined, Strubberg acknowledged that the defendant's demeanor and tone had changed when the recorded conversation turned to family matters.

¶ 46 Gwendolyn testified that the defendant frequently called her from the St. Clair County jail. She further testified that the defendant had called her two or three times a day during his "last

trial" and that the call she received from him on the evening of September 10, 2013, had been placed during his last trial. After counsel had Gwendolyn listen to the recording of the call, she acknowledged that the voices on the recording were hers, the defendant's, and Rachelle's. Gwendolyn testified that she could hear fear and frustration in the defendant's voice when he was discussing whether to testify in his defense. Gwendolyn noted that the defendant's voice had subsequently "calmed down" when the conversation about the trial ended. Counsel had Gwendolyn confirm that toward the end of the conversation about whether the defendant was going to testify, the defendant had stated that he knew that he had not done anything and was "trying to win." Gwendolyn advised the jurors that the defendant had not subsequently testified in his defense.

¶ 47    In its closing arguments, the State maintained that it had proven beyond a reasonable doubt that Black and McVay were "executed" and that the defendant was the executioner. The State replayed and discussed at length the recording of Black's 911 call, emphasizing that Black had "unequivocally" identified the defendant as the shooter before he died. The State further emphasized that a fresh cigarette butt with the defendant's DNA on it had been found on the street near Black's car. The State submitted that Tierra had told the police the truth in her second and third video-recorded interviews and that her demeanor while testifying suggested that she had been afraid to tell the truth at trial. The State also intimated that fear had prompted Tierra to prepare her recantation affidavit for Jaymo in February 2013. The State argued that the vehicle repair estimate found near McVay's body was consistent with the notion that Kidd had given the defendant a ride to and from the Banks sisters' house on the morning of the murders. The State further argued that the self-defense discussion that the defendant had with Rachelle and Gwendolyn was an admission that he had committed the murders. The State did not reference the defendant's postarrest interviews other than noting that the defendant had indicated that he, Black, and McVay had been "partners."

¶ 48    In response, defense counsel argued that there were too many unanswered questions to allow for a finding of guilty beyond a reasonable doubt. Counsel suggested, *inter alia*, that by basing their investigation solely on Black's 911 call, the police had neglected to adequately investigate whether Jones or Kidd might have been the shooter. Counsel argued that the defendant might have dropped the cigarette butt found on the street when he visited Tatanisha on the morning of September 17, 2009. Counsel argued that Tierra had told the truth in her first video-recorded interview and that the fear she exhibited while testifying reflected her fear of what might happen if she did not say what the investigators had "manipulated" her to say. Counsel maintained that the recording of the defendant's September 2013 phone call to Gwendolyn and Rachelle had captured the fear and frustration that he had been experiencing during his first trial and that the defendant had considered claiming self-defense because he was scared and desperate. Emphasizing that the defendant had also said that he had not done anything, counsel suggested that the State was taking the phone conversation out of context. Urging the jurors to return a verdict finding the defendant not guilty, counsel contended that the State had failed to prove its case beyond a reasonable doubt.

¶ 49    In rebuttal, the State argued that in addition to Black's 911 call, the fresh cigarette butt, the accounts that Tierra gave in her second and third interviews, and the defendant's admission to Rachelle and Gwendolyn, the defendant's guilt was further supported by statements he made during his postarrest interviews. The State emphasized that the defendant had claimed, *inter alia*, that he could not remember where he was "the night two of [his] friends were

- 10 -

murdered." The State further argued that when the defendant listened to his "partners being murdered" on the recording of the 911 call, he had shown "absolutely no emotion" because he was the person doing the shooting. The State contended that the 911 call was "the ultimate truth detector in this case" because Black had no motivation to either lie or "frame his friend." The State maintained that there was no fear in the defendant's voice when he spoke with Rachelle and Gwendolyn from jail.

¶ 50   On February 25, 2016, after deliberating for approximately four hours, the jury found the defendant guilty on both counts of first degree murder. During its deliberations, the jury requested and was provided with the recording of Black's 911 call and the recording of the defendant's September 2013 conversation with Gwendolyn and Rachelle. The parties agreed that it was proper to allow the jury to hear the recordings as many times as it wanted so that it could independently evaluate the recordings' contents.

¶ 51   In March 2016, the defendant filed a motion for a new trial, alleging, *inter alia*, that the circuit court erred in allowing the State to show the jury the redacted video recording of his second postarrest interview with the police. The motion alleged that the recording had no evidentiary value and was admitted for the sole purpose of allowing Walker "to opine on his theory of the case."

¶ 52   When denying the defendant's motion for a new trial, the circuit court noted that Judge Baricevic had viewed the redacted versions of the recordings before finding that they were admissible. The court declined to disturb Judge Baricevic's ruling but noted the defendant's objection. The circuit court subsequently entered judgment on the defendant's convictions and sentenced him to mandatory consecutive terms of natural-life imprisonment. See 730 ILCS 5/5-8-1(a)(1)(c)(ii), 5-8-4(a)(i) (West 2006); *People v. Petrenko*, 237 Ill. 2d 490, 505-07 (2010). In June 2016, the defendant filed a timely notice of appeal.

¶ 53                                      DISCUSSION

¶ 54   The defendant argues that the circuit court abused its discretion in allowing the State to introduce the redacted video recording of his second postarrest interview and that the error warrants that he be granted a new trial. Citing *People v. Hardimon*, 2017 IL App (3d) 120772, the defendant maintains that the recording had no probative value and should not have been played for the jury. The defendant specifically claims that he was prejudiced by the portions of the recording during which the investigators commented on the evidentiary strength of Black's 911 call and expressed their beliefs as to the defendant's guilt. The State counters that *Hardimon* is readily distinguishable from the present case and that even assuming that the circuit court's ruling on the defendant's motion *in limine* was erroneous, the error was harmless beyond a reasonable doubt. We agree with the State.

¶ 55   Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Any statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission, even if it is not inculpatory or against interest." *People v. Summers*, 353 Ill. App. 3d 367, 374-75 (2004).

¶ 56   Statements made by police officers when questioning a defendant, including opinions and observations regarding the defendant's guilt or credibility, are generally relevant and admissible to demonstrate the statements' effects on the defendant, to provide context to the

defendant's responses, or to explain the logic and course of the officers' interview or investigation. See *People v. Moore*, 2012 IL App (1st) 100857, ¶ 52; *People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 33-37; *People v. Munoz*, 398 Ill. App. 3d 455, 488 (2010). Such is the case even if the statements themselves would not be admissible as direct testimony. See *Theis*, 2011 IL App (2d) 091080, ¶¶ 35-37. "However, Illinois courts have long recognized, as a matter of common law, that a trial court may exercise its discretion to exclude evidence, even when it is relevant, if its prejudicial effect substantially outweighs its probative value." *People v. Walker*, 211 Ill. 2d 317, 337 (2004). Illinois Rule of Evidence 403 likewise recognizes that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 57    As a reviewing court, we will not reverse the circuit court's ruling on a motion *in limine* absent an abuse of discretion. *People v. Hanson*, 238 Ill. 2d 74, 96 (2010); *People v. Enis*, 139 Ill. 2d 264, 281 (1990). An abuse of discretion will be found where the circuit court's ruling is fanciful, arbitrary, or unreasonable or where no reasonable person would take the view adopted by the circuit court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 58    As previously indicated, the defendant cites *Hardimon*, 2017 IL App (3d) 120772, in support of his claim that he should be granted a new trial. In *Hardimon*, the defendant was interviewed by investigators following a fatal shooting outside a nightclub that the defendant had allegedly been kicked out of after allegedly arguing with the victim. See *id.* ¶¶ 15-24. During the interview, the defendant acknowledged that he had been outside the club when the shooting occurred, but he denied any involvement in the shooting and denied being ejected from the club following an argument. *Id.* ¶¶ 18-19, 36. At the defendant's trial, a redacted video recording of the interview was shown to the jury, and the defendant was found guilty of first degree murder and unlawful possession of a weapon by a felon. *Id.* ¶¶ 15, 29. On appeal, the defendant claimed that he had been denied the effective assistance of counsel due to his attorney's failure to file a motion to further redact the recording of the interview. *Id.* ¶ 32. The defendant specifically argued that "the final two-thirds" of the recording should have been redacted because the contents were irrelevant and more prejudicial than probative. *Id.* Our colleagues in the Third District agreed and granted the defendant a new trial. *Id.* ¶¶ 37-39, 46.

¶ 59    The *Hardimon* court indicated that the redacted recording of the defendant's interview was approximately 80 minutes long and that the first 20 or 30 minutes included relevant discussions and admissions. *Id.* ¶¶ 34, 36. After approximately 30 minutes, however, the tenor of the interview shifted from conversational to accusatorial, and during the remaining 50 minutes, the police pressured and goaded the defendant to confess, despite his persistent claims of innocence. *Id.* ¶¶ 19, 36. The investigators also made numerous irrelevant and prejudicial statements, which included repeated accusations of guilt, suggestions that the defendant was a liar and a cold-blooded killer, comments as to how easy it would be for the State to convict the defendant, and implications that a jury would view the defendant with disgust. *Id.* ¶¶ 21-24, 34, 36. While acknowledging that statements made by investigators during an interview are admissible to demonstrate the defendant's responses or the statements' effects on the defendant (*id.* ¶ 35), the *Hardimon* court determined that, because the defendant had not changed his version of events during the final two-thirds of interview, the final two-thirds had no probative value and were highly prejudicial (*id.* ¶¶ 37-38). The court thus concluded that defense counsel's performance was deficient for failing to file a motion to redact the final two-thirds. *Id.* ¶ 37. Noting, *inter alia*, that there was no physical evidence directly connecting the

defendant to the murder and that no witnesses had identified the defendant as the shooter, the *Hardimon* court further concluded that the defendant had demonstrated resulting prejudice. *Id.* ¶ 39.

¶ 60        Notably, in *People v. Dunbar*, 2018 IL App (3d) 150674, our colleagues in the Third District declined to extend *Hardimon* where the interview in question only shared "some characteristics" of the *Hardimon* interview. See *id.* ¶ 53; see also *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 53 (finding *Hardimon* "factually distinguishable"). In *Dunbar*, the police responded to a call of an infant not breathing at the apartment where the defendant lived with his girlfriend, Leila Martin, and her infant son, J.M. *Dunbar*, 2018 IL App (3d) 150674, ¶¶ 3, 19. When the police arrived, J.M. had no pulse, and there were obvious injuries to his head. *Id.* ¶ 3. Additional injuries were discovered after the infant was transported to a hospital emergency room, where he was pronounced dead. *Id.* ¶¶ 4, 12.

¶ 61        When the defendant was subsequently interviewed by the police, he indicated that J.M. had been put to bed without incident at approximately 10 p.m. and was fine when the defendant gave him a bottle around 2 or 3 a.m. *Id.* ¶ 6. The defendant advised that when Martin checked on J.M. about 30 minutes later, the child was not breathing. *Id.* When the defendant was asked how J.M. might have been injured, the defendant stated that "maybe J.M. had hit his head somehow." *Id.* The *Dunbar* court described the remainder of the defendant's interview as follows:

> "As the interview progressed, the officers became more aggressive in their interview tactics. At no point, however, did defendant admit that he had committed or taken any part in the commission of the offenses, despite the police officers trying various interview techniques. The officers tried to get defendant to state that Martin had killed J.M., accused defendant of the crime, and told defendant that when the pictures of the dead infant would be shown, a jury would not believe defendant and would find that both defendant and Martin were responsible for the baby's death." *Id.*

¶ 62        At the defendant's trial, the jury was shown a video recording of the interview. *Id.* ¶ 16. During closing arguments, defense counsel maintained that the defendant had not succumbed to the officers' interrogation techniques because he was being forthright and truthful. *Id.* ¶ 19. The defendant was ultimately convicted of first degree murder and aggravated battery of a child. *Id.* ¶¶ 1, 20.

¶ 63        On appeal from his convictions, the defendant argued, *inter alia*, that defense counsel was ineffective for failing to move to redact certain portions of the video recording of his interview with the police. *Id.* ¶ 23. Citing *Hardimon* (*id.* ¶ 53), the defendant specifically maintained that counsel was ineffective for "failing to file a motion seeking to redact the portions of [the] interview in which meaningful conversation between defendant and the detectives ground to a halt" (*id.* ¶ 51).

¶ 64        When rejecting the defendant's ineffective-assistance-of-counsel claim, the *Dunbar* court distinguished *Hardimon* on two grounds. *Id.* ¶¶ 51-54. Noting that there was no evidence in *Hardimon* that defense counsel "utilized the contested portions of the defendant's interview to craft an argument" (*id.* ¶ 53), the court first found that counsel's failure to file a motion to redact was a matter of trial strategy (*id.* ¶ 51). The court secondly found that even assuming counsel had filed a motion to redact, the defendant's entire interview would have been admitted as relevant and probative. *Id.* ¶ 54. Noting that statements made by investigators during an interview are admissible to demonstrate the defendant's responses or the statements' effects

- 13 -

on the defendant, the *Dunbar* court concluded that the statements made during the defendant's interview did not rise to "the same prejudicial level as the statements described in *Hardimon*" (*id.*), even though the interviews in both cases shared "some characteristics" (*id.* ¶ 53).

¶ 65        Here, the defendant's reliance on *Hardimon* is misplaced, and we reject his assertion that the redacted recording of his second interview had no probative value. We further conclude that the circuit court did not abuse its discretion in determining that the probative value of the recording was not substantially outweighed by its potential for unfair prejudice.

¶ 66        The defendant's second interview was essentially a continuation of his first interview, so much so that the conclusion of the first interview would have been nonsensical without it. As noted, during the first interview, the investigators advised the defendant that they had a secret phone call to reveal, and the defendant expressed his interest in hearing it. At the conclusion of the first interview, the defendant agreed to speak with the investigators again at a later time; the investigators indicated that they would reveal the secret call at that time, and the investigators told the defendant to think about where he might have been when the murders occurred. As a general premise, the recording of the second interview was thus relevant and necessary to place the entire interview process in context. Moreover, there was not a breakdown of meaningful communication until the end of the second interview.

¶ 67        The redacted recording of the defendant's second interview was specifically relevant to demonstrate the effect that Black's 911 call had on the defendant. The playing of the 911 call introduced a new dynamic into the interview process that was not present in *Hardimon*. As noted, the defendant showed no emotion while listening to Black's 911 call at the commencement of the second interview, but his demeanor notably changed after hearing it. Additionally, the defendant initially denied that Black had stated his name and then declined the investigators' offer to play the recording a second time.

¶ 68        The redacted recording of the second interview was also relevant and admissible to show the defendant's responses to the investigators' questions and comments about the 911 call and to place his responses in context. Although the defendant repeatedly contended that Black's 911 call was "bulls***," he nevertheless addressed it and attempted to minimize its significance. The defendant claimed, *inter alia*, that Black was confused and could have named anyone as the shooter. Moreover, after the defendant was advised that the 911 call was admissible evidence and that his inability to recall his whereabouts at the time of the murders was not a defense, the defendant abandoned his claim that he had probably been at a hotel when the killings occurred and indicated that he might have been at a friend's house. Thus, unlike the defendant in *Hardimon*, as the interview progressed, the defendant continued to make statements that held probative value and his alibi changed.

¶ 69        In conjunction with the recording of the first interview, the portions of the second interview, during which the defendant's apparent lack of remorse over the loss of his alleged "partners" was exhibited and discussed, were also probative. Although the defendant offered explanations for why he had sometimes smiled when Black's name was mentioned, the jury could have concluded that the defendant's general attitude towards both victims was inconsistent with that of someone discussing the violent deaths of two of his friends.

¶ 70        With respect to the recording's potential for unfair prejudice, we note that Walker's extensive discussions regarding Black's "dying declaration" and how a jury would perceive it were redacted prior to trial, the portions of the redacted recording during which the investigators expressed their beliefs as to the defendant's guilt and stressed the compelling

nature of Black's 911 call were relatively brief, and the investigators' comments and observations were generally relevant under the circumstances. *Cf. Hardimon*, 2017 IL App (3d) 120772, ¶¶ 34, 36-38 (finding that the majority of the 80-minute recording that the jury viewed contained irrelevant and highly prejudicial comments). Furthermore, although the investigators were accusatorial throughout the defendant's second interview, the tone of the interview generally remained conversational, and the investigators were not threatening or overly aggressive, as the police in *Hardimon* seemingly were. See *id.* ¶¶ 21-24. Additionally, when cross-examining Walker, defense counsel emphasized that the defendant had consistently maintained his innocence during both interviews. We also note that the jury watched the redacted recordings of the interviews only once and did so without the benefit of a transcript.

¶ 71    Ultimately, although the defendant's second interview with the police shared "some characteristics" of the interview in *Hardimon* (*Dunbar*, 2018 IL App (3d) 150674, ¶ 53), the entire interview was relevant and probative, and its probative value was not substantially outweighed by the danger of unfair prejudice. We accordingly conclude that the circuit court did not abuse its discretion in denying the defendant's pretrial motion to exclude the redacted recording of the second interview. Furthermore, even assuming *arguendo* that the court should have prohibited the State's introduction of the recording, any resulting error was harmless in light of the remainder of the evidence establishing the defendant's guilt.

¶ 72    "Error will be deemed harmless and a new trial unnecessary when 'the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result.' " *People v. McKown*, 236 Ill. 2d 278, 311 (2010) (quoting *People v. Arman*, 131 Ill. 2d 115, 124 (1989)). Here, Black's 911 call was not merely a dying declaration that was "singly sufficient" to support the defendant's murder convictions (*People v. Hatchett*, 397 Ill. App. 3d 495, 511 (2009)), the call produced a live recording of the crime in progress, which is extremely compelling evidence (see *Patterson*, 2017 IL App (3d) 150062, ¶¶ 22-23). Nothing suggests that Black had any reason to falsely implicate the defendant, and Black's dying declaration was corroborated by the fresh cigarette butt found near his car and by Tierra's identification of the defendant as the shooter. Although in his second interview, the defendant maintained that Black was mistaken as to the identity of the shooter, the jury obviously rejected that claim.

¶ 73    Tierra's second and third statements to the police, in which she positively identified the defendant as the shooter, were also independently sufficient to support the defendant's convictions. See *People v. Logan*, 352 Ill. App. 3d 73, 79-81 (2004); *People v. Morrow*, 303 Ill. App. 3d 671, 675-77 (1999). Although the defendant suggests that Tierra's second and third statements should be viewed with suspicion in light of her other statements and trial testimony, we must presume that the jury concluded that the former were more credible than the latter. See *Logan*, 352 Ill. App. 3d at 80-81; *Morrow*, 303 Ill. App. 3d at 676-77. Moreover, Tierra's identification of the defendant as the shooter was consistent with Black's 911 call and was also supported by the cigarette butt found near Black's car.

¶ 74    The jury could have further concluded that the defendant implicitly acknowledged his guilt during the recorded telephone conversation that he had with Gwendolyn and Rachelle despite his agreement with Rachelle's contention that he had not done anything. The jury could have reasoned that because Rachelle knew that the call was being recorded, her contention was

meant to obscure and sanitize the defendant's earlier discussions regarding his proposed claim of self-defense. The jury could have further reasoned that the defendant had called Gwendolyn and Rachelle using another inmate's identifications numbers in an attempt to conceal their conversation or delay the discovery of its occurrence.

¶ 75 From the defendant's first interview, the jury could have also inferred the defendant's consciousness of guilt by finding that he had falsely asserted, *inter alia*, that he had not been to Tatanisha's house since August 2009, that he had not learned that his friends had been killed until days after the fact, and that he could not recall where he had been when the murders occurred but had "probably" been at a hotel. See *People v. Milka*, 336 Ill. App. 3d 206, 227-28 (2003); *People v. Wilson*, 8 Ill. App. 3d 1075, 1079 (1972). The defendant's consciousness of guilt could further be inferred from the first interview's discussions suggesting that he had been avoiding the police for months. See *People v. Henderson*, 39 Ill. App. 3d 502, 507-08 (1976). Additionally, given the evidence of the defendant's relationship with Tatanisha and the fact that McVay and Black were murdered in her front yard at approximately 4:35 a.m., the jury could have concluded that jealousy was the defendant's possible motive. See *People v. Shack*, 396 Ill. 285, 292 (1947); *People v. Coleman*, 116 Ill. App. 3d 28, 35 (1983).

¶ 76 We lastly emphasize that the defendant's interviews with the police were not the central pieces of the State's case; Black's 911 call and the defendant's recorded conversation with Gwendolyn and Rachelle were. Moreover, as previously noted, during its deliberations, the jury requested and was provided with the recording of the 911 call and the recording of the defendant's conversation with Gwendolyn and Rachelle. Under the circumstances, that the jury did not also request the recordings of the defendant's interviews suggests that it did not perceive those recordings as being particularly important one way or the other. In any event, given the remainder of the State's evidence, we cannot conclude that the jury's verdict might have been different had it not viewed the redacted recording of the defendant's second interview with the police, which further distinguishes the present case from *Hardimon*.

¶ 77 CONCLUSION

¶ 78 For the foregoing reasons, we conclude that the circuit court did not abuse its discretion in denying the defendant's pretrial motion to prohibit the State's introduction of the redacted recording of his second interview with the police and that even assuming otherwise, the error was harmless. Accordingly, the defendant's convictions for first degree murder are hereby affirmed.

¶ 79 Affirmed.