NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 210754-U

NO. 4-21-0754

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 29, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| CHRISTOPHER J. COLLINS, | ) | No. 15CF1379 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court. Justices Harris and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, finding (1) defense counsel did not render ineffective assistance by failing to seek redaction of portions of defendant's recorded interview with police investigators and (2) the trial court's sentence was not excessive.

¶ 2    In October 2017, a jury found defendant, Christopher J. Collins, guilty of one count of aggravated battery of a child, causing great bodily harm (720 ILCS 5/12-3.05(b)(1) (West 2014)). On November 20, 2017, the trial court sentenced defendant to 20 years' incarceration. On December 6, 2017, defendant's trial counsel filed a motion to reduce the 20-year sentence but did not file an accompanying notice of motion or take any other action on the motion. After a lengthy delay, in December 2021, the court granted the State's motion to strike defendant's motion to reduce sentence.

¶ 3        Defendant appealed, arguing in part his trial counsel rendered ineffective assistance for failing to request redactions to references to "shaken baby syndrome," "brain shearing," injuries not suffered by the victim, officers' theories about the case, and irrelevant other crimes and bad acts from a recording of his interview with police investigators. Defendant also argued his sentence was excessive.

¶ 4        On September 13, 2022, we dismissed the appeal for lack of jurisdiction. *People v. Collins*, No. 4-21-0754 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)). On December 8, 2022, we vacated our judgment dismissing the appeal for lack of jurisdiction in compliance with *People v. Collins*, No. 129128 (Ill. Dec. 7, 2022) (supervisory order). We now consider the case on the merits and affirm.

¶ 5                                I. BACKGROUND

¶ 6                                A. Pretrial

¶ 7        On September 20, 2015, the State charged defendant with aggravated battery of a child causing great bodily harm based on injuries sustained by his girlfriend's 16-month-old daughter, B.C. Before trial, defense counsel moved to suppress a recorded interview between defendant and two police officers, Detective Timothy Rivest and Sergeant Justin Bouse, conducted at the hospital where B.C. had been taken for treatment. In the motion, counsel argued defendant's statements were the result of coercion. At the hearing on the motion, counsel also argued defendant did not voluntarily waive his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Counsel did not argue any statements by the officers were inadmissible or irrelevant, nor did counsel seek to redact any potions of the interview. The trial court denied the motion.

¶ 8                                B. Trial

¶ 9        At trial, B.C.'s mother, Sonya, testified she had two children, B.C., born May 19, 2014, and N.C., born January 29, 2013. Defendant was not the father of the children. Sonya began dating defendant in 2014 and, in September 2015, Sonya and her children were living with defendant in Rantoul, Illinois. Sonya was employed with a home-care company and worked an overnight shift. Defendant provided childcare while Sonya was working.

¶ 10        On September 20, 2015, Sonya returned from work and slept for about five hours. She did not notice anything unusual before she went to sleep. When Sonya woke up, the children were sleeping in their room, and she left to attend a baby shower. Sonya was at the baby shower for about three hours and left the children in defendant's care. Defendant's sister, Shelby, also attended the baby shower and dropped off her daughter, L.C., who was between one and two years of age, to be cared for by defendant.

¶ 11        When Sonya returned home, B.C. was laying on defendant, who said B.C. was not feeling well. When Sonya placed B.C. in a high chair, B.C. tilted her head to the side and would not eat. Sonya testified defendant was upset and told her the children had been "acting up." Defendant's sister also pointed out a bruise behind B.C.'s ear, and B.C. had a mark either below her eye or on her forehead. After that, B.C. began to vomit for about an hour. It was unusual for B.C. to do so, and Sonya decided to take her to the hospital.

¶ 12        Defendant accompanied Sonya when she took B.C. to the hospital. On the way there, Sonya spoke with defendant about what happened. Defendant stated perhaps B.C. fell, was in a fight with the other girls, or another girl hit her with a toy. Defendant told the same theories to the doctors at the hospital.

¶ 13        On cross-examination, Sonya stated she did not recall telling defendant's sister or anyone else at the baby shower that B.C. had been lethargic, had not been acting like herself, and

might be coming down with a virus. Instead, Sonya stated B.C. had not been lethargic or had any recent accidents or trauma to the head before the afternoon of September 20. Defense counsel asked Sonya if she initially said she did not want to take B.C. to the hospital because she did not want to get involved with the Department of Children and Family Services (DCFS). Sonya testified she never said that and she had never been involved with DCFS before. She also denied she took B.C. to the hospital only at the insistence of defendant's mother and sister. Instead, she stated she did not take B.C. to the hospital when she first noticed the bruises because she thought it was a "common fall" or "nothing serious at the moment." But when B.C. started vomiting, Sonya thought it was unusual. In response to further questions, Sonya testified, although B.C. did not appear afraid of defendant when Sonya arrived home on September 20, 2015, B.C. had acted "scared toward" defendant on previous occasions.

¶ 14        Amanda Christians, an emergency room nurse who treated B.C., testified B.C. was very lethargic and nonresponsive. Christians observed a bruise on B.C.'s right forehead, bruising behind the right ear, and blood in the right ear. She described Sonya as seeming "unknowing as to what was going on," in that she did not know what happened to B.C. Defendant seemed withdrawn and, when Christians asked questions directed to both defendant and Sonya, defendant made very little or no eye contact. Sonya answered most of the questions.

¶ 15        Ricardo Lema, a hospital physician who treated B.C., testified about his experience in pediatrics and was qualified as an expert. Lema noted B.C. was lethargic and nonresponsive. She also did not respond normally to painful stimuli. Lema noted the bruising and described the bruising behind the right ear as "what we call battle sign," which is "consistent with a basilar skull fracture." Lema ordered a computed tomography scan, which showed bleeding above and on the brain and "numerous, multiple skull fractures." The scan also showed

complex skull fractures at the base of the skull where the brain connects to the spinal cord. Lema stated, "most of the times that comes with significant force or injury that occurs to actually injure that or crack, if you will, that part of the—of the skull." Lema stated that type of fracture increases the suspicion of nonaccidental trauma. When asked if he was able to determine the cause of B.C.'s injuries, Lema stated:

> "I don't think I can say exactly what the mechanism of injury was, but I can say, from looking at the skull fractures, that it was again nonaccidental trauma, that something happened to her that was caused by something or someone. The exact—again, the exact mechanism, I don't know, but I do know that to cause that kind of basilar skull fracture, it did take a significant amount of force."

In Lema's opinion, such a force could not be caused by another child. An older teen or adult could cause it. On cross-examination, Lema agreed the injury could be caused by a child's head being struck on an object, such as a piece of furniture, if it occurred with significant force. Lema also stated multiple fractures were normally caused by repetitive blows to the head.

¶ 16　　　　Brent Reifsteck, a hospital pediatrician in charge of the child abuse safety team, was qualified as an expert and testified he consulted on B.C.'s case. Reifsteck examined B.C. on September 22, 2015. B.C. was intubated at the time, and mechanical ventilation was helping her breathe. She had an IV and a tube that went to her stomach to make sure she received good nutrition while she recovered. Reifsteck observed the bruising, brain bleeding, and skull fractures, and he also noted B.C. had a fractured wrist and retinal hemorrhage. After ruling out other potential causes, Reifsteck opined, with "[a] very high degree of medical certainty," B.C.'s injuries were caused by adult-inflicted physical trauma or child abuse. Reifsteck further stated

the event leading to the injuries would have happened almost immediately before the onset of symptoms and opined it could not have happened accidentally and "had to have been done with an adult amount of force." He disagreed an injury occurring hours earlier could have been exacerbated by physical activity, leading to the symptoms manifesting later.

¶ 17    Detective Rivet testified about the interview he and Sergeant Bouse conducted with defendant at the hospital. The interview lasted approximately 3 hours and 20 minutes, was recorded, and was played for the jury. Rivet testified defendant gave several different statements about how B.C. was injured. Rivet also took photographs of B.C.'s injuries that were shown to the jury. Those photographs were consistent with the descriptions of her injuries given by previous witnesses. Bouse provided similar testimony and said he gave defendant *Miranda* warnings. When asked for examples of different statements given by defendant, defense counsel objected, stating the recording would "spell out everything" and arguing, "it's prejudicial and it may be a misinterpretation of what's on that tape." Counsel stated the jury "should hear the tape as is." The trial court agreed the testimony would tend to highlight certain parts of the recording and sustained the objection.

¶ 18    The recording was played for the jury. Both officers spoke during the interview, with Rivet speaking more. For purposes of simplicity, the following description of the interview references terms such as "the officers" or "an officer" rather than specifying which person was speaking at any given time.

¶ 19    The officers spent the first portion of the interview telling defendant about themselves, asking defendant about his job and his relationship with Sonya and B.C., and generally discussing how good people sometimes make mistakes. After about 40 minutes, the officers began asking for details of the events of the weekend. Defendant initially told the

officers, after Sonya left for the baby shower, he put the three children down for a nap in the spare bedroom on a mattress on the floor. About 30 minutes later, he heard the two older girls awake and checked on them. B.C. was on the bed, but not where she was before, and there were toys all around the area. Defendant also stated he went to check on the girls because he heard a "thunk," like something hitting the floor. He further said N.C. liked to throw her toys, including plastic doll houses.

¶ 20        When the officers went through the events again, defendant added B.C. finished her nap in another location and then sat in her walker. Defendant indicated she was not acting normally in the walker or after his mother and sister arrived back to the apartment with Sonya. He said because B.C. was not acting normally, they took her to the hospital. Defendant further added B.C. vomited about 20 minutes before they left for the hospital and had refused to eat after her nap. He said B.C. had been fine before the nap.

¶ 21        Defendant stated he did not know what was going on and no one had told him how B.C. was, other than he heard from another room the word "fracture." The recording indicates defendant had been removed from the same room as Sonya after she became upset and accused him of hitting B.C. When asked what he thought happened, defendant theorized his niece, L.C., may have hurt B.C. He described L.C. as a large child with anger problems and a "pretty violent kid," who previously bit B.C. and struck a kitten's head on the floor.

¶ 22        Shortly after an hour into the interview, the officers told defendant they always figure out what happened but would like to find out "why" something happened. They then told defendant they did not think he was telling the full truth about what happened. The officers discussed with defendant ways children could be aggravating. They also told defendant about the

child abuse expert (Reifsteck) who would be coming to see B.C. and stressed the benefits of being truthful when it came to factors such as potential charges and sentencing.

¶ 23      Beginning at approximately 1:18:45 in the recording, the officers told defendant they had been talking to the medical doctors and a lot of medical evidence had been "stacking up." The officers told defendant B.C. had fractures and bleeding, and there was no doubt from the doctors the injuries were caused by adult force and could not have happened from another child or through a fall. Thus, there was no doubt in the officers' minds defendant was responsible for the injuries. The officers stressed the truth could help obtain better medical treatment for B.C. and noted Sonya told them defendant had been in a bad mood when she returned from the baby shower and said he was "throwing" and "slamming" things. They said Sonya reported defendant told her he was frustrated with the children. Defendant admitted throwing the food tray from the high chair onto the ground because he was agitated.

¶ 24      Beginning at approximately 1:23:25, the officers told defendant B.C. suffered the following injuries: three skull fractures caused by adult force, subdural bleeding and other bleeding around the brain, compression fractures "up and down her entire spine," and a broken left wrist. The officers stated the injuries did not happen from L.C. or N.C. At approximately 1:24:00, defendant began crying. The officers stated they were "throwing things out there" to try to figure out what happened and repeated B.C. had compression fractures in her entire spine, probably from being thrown down. Beginning at 1:24:24, an officer told defendant B.C. had "shearing of the brain, *** like where parts of her brain is sheared off, I believe." The officer further stated, "and that's from what they call coup contrecoup, which is shaking." However, the officer then said "the only way," followed by, "'I don't want you to quote me on that," and, "it may be the only way, I'm not sure." The officer next said B.C. also had retinal hemorrhaging,

stating one of the only ways to get retinal hemorrhaging and shearing of the brain is through shaking. Thus, the officer told defendant there was no doubt in his mind defendant shook B.C. He further theorized defendant shook B.C. and then perhaps threw her down. That portion of the conversation ended at approximately 1:25:34.

¶ 25 Defendant continued to deny he harmed B.C. The officers expressed empathy for defendant and continued stating they wanted to know why the injuries happened so defendant would not be "painted as some monster." At approximately 1:31:45, an officer asked defendant if he shook B.C., and defendant stated he did not and continued to deny he hurt B.C. Defendant said there were times he accidentally "plopped" B.C. down on the floor but said he did not hurt the children. At approximately 1:40:40, the officers again stated there was no doubt defendant shook B.C. and repeated B.C. had retinal hemorrhaging and shearing of the brain. About four minutes later, Defendant stated sometimes he might get a little rough and said he had pulled B.C. up by her wrists and heard a "pop," which could account for the wrist fracture.

¶ 26 The officers theorized "plopping" B.C. down could cause compression fractures. Defendant continued to deny knowing more, but spoke of previous times he accidentally fell with B.C. From approximately 1:51:52 to 1:53:54, the officers speculated defendant was tired and grouchy, had no relief from dealing with three children, and at some point grabbed B.C. by the wrists, causing the wrist fracture, then shook her, causing the shearing of the brain, then threw her down, causing the compression fractures. The officers noted that still did not explain the skull fractures.

¶ 27 The officers said defendant was not making sense, and defendant was silent and cried for a while. He then repeated his story but added B.C. refused to lie back while he was changing her diaper and she "threw herself" after he told her multiple times to lie back. Although

difficult to hear, at 2:03:01, it sounds like defendant then said, "she hit her head." Defendant added, "and that infuriated me." Defendant then said, "so I grabbed her by her hands and I pulled her up, probably a little more force than need be." Defendant said he checked her, "and there was nothing there." He put her on the coffee table while he disposed of the diaper, and she was face down on the floor when he got back, and L.C. was sitting there laughing. He said he then put B.C. in the walker and L.C. "flipped the walker." He said B.C. was screaming and he was unable to comfort her, so he put her back on the floor, and the recording indicates he put her there harder than normal. Defendant left and smoked three to four cigarettes and then came back. He then noticed B.C. was not acting normally. At 2:12:55, the officers asked defendant why he hesitated to tell them that story earlier. Defendant was silent for a bit and then said he guessed because he wanted to forget that it happened. At approximately 2:18:58, defendant described how B.C.'s eyes did not look normal and stated he did not hit the children. An officer then stated twice, "that's probably from the shaking that happened."

¶ 28 The officers asked defendant if he sent any text messages about what had happened. Defendant was hesitant to show them his phone. After the officers said they were going to seize his phone, he told them it contained information about "weed." The officers said they were not concerned about that, and defendant showed them his phone. The record indicates nothing incriminating was found on it.

¶ 29 The last hour of the interview consisted of the officers continuing to question defendant's version of the events. The officers pointed out inconsistencies and noted they still did not know the cause of the skull fractures and brain injury. The officers stated defendant's version of the events was inconsistent with what the doctors were going to say. At approximately 2:26:00, defendant said he did not know how the injuries referenced occurred, and an officer

said, "from shaking," and noted the retinal hemorrhaging. The officers noted it did not have to be long shaking and could be something less than three seconds. The officers continued to discuss shaking and how it could cause injury for approximately one minute and then said Dr Reifsteck would say there was an adult amount of force. Defendant repeated he did not shake B.C., and the discussion of the brain injuries continued until around 2:33:20, with the officers speculating it happened, not by intentional shaking, but when defendant pulled B.C. up and moved her around multiple times while he was angry. Defendant indicated agreement with that possibility but said he did not pick up B.C. and shake her and would never intentionally hurt her.

¶ 30        Defendant next spoke about stress in his life and previous mental-health or emotional issues. The remainder of the interview largely consisted of the officers trying to figure out how the skull fractures occurred. The officers asked defendant to explain the events in reverse order and pointed out inconsistences. They also continued to offer theories such as defendant hitting B.C. with something, throwing her into something, or hitting her head on the floor, but defendant did not provide any further details about the incident. Toward the end of the interview defendant expressed concern about how tired he was and accused the officers of "poking fun" at him with their questioning. The interview concluded at 4:27 a.m.

¶ 31        Defendant's sisters, Shelby and Bailey Collins, testified for the defense. Shelby testified she visited defendant with her daughter on September 18, 2015. During the visit, Sonya arrived home and began playing with the children. According to Shelby, while playing with B.C., Sonya swung B.C. in a circle and accidentally "smacked [B.C.'s] head hard off of the entertainment center over on her right side." B.C. started crying, and Sonya comforted her, but B.C. cried for 10 to 15 minutes, which Shelby described as "kind of hysterics." Shelby said, "then, after that, she was fine." Shelby stayed the night, and B.C. did not seem like she was

hungry when offered breakfast. Shelby said she did not tell defendant at that time what happened because it "slipped [her] mind" and she did not think "it was that bad or anything."

¶ 32　　　　Bailey testified she was at defendant's apartment on September 19, 2015, and B.C. was inactive for three hours, which was unusual for her. On September 20, 2015, Bailey attended the baby shower with her mother, Shelby, and Sonya. According to Bailey, Sonya told her at the shower B.C. "was not herself" or was "withdrawn," and Sonya thought B.C. was coming down with a virus and should see a doctor. Bailey also testified, for purposes of impeachment, that Sonya said at the apartment she did not want to take B.C. to the hospital with bruises because she feared DCFS would become involved.

¶ 33　　　　The defense recalled Sonya as a witness, who stated she did not recall ever swinging B.C. around and accidentally causing her head to strike a piece of furniture. She also testified she did not recall B.C. being inactive before going to the baby shower or telling Bailey B.C. was withdrawn and should see a doctor.

¶ 34　　　　In closing arguments, the State contended defendant was angry, frustrated, and "in a rage" and emphasized his admission he picked up B.C. by the wrist and put her on the floor with more force than usual. The State argued defendant told the officers enough to admit culpability without giving an ultimate statement about what happened. The State further argued the doctors were credible. The State relied on the medical testimony to establish defendant could have been the only person responsible for the nonaccidental injuries, with a prompt onset of symptoms which were inflicted by an adult-level amount of force. The State referred to injuries as testified to by Lema and Reifsteck. No references were made to "shaking," "shaken baby syndrome," "brain shearing," or "coup contrecoup."

¶ 35　　　　Defense counsel emphasized an instruction for the jury to consider the conditions and circumstances under which defendant's statement was made. Counsel stressed defendant agreed to cooperate with police at 1 a.m., while he was tired. Meanwhile, the police "hammered," "pushed," and "prodded" defendant with various scenarios. Counsel argued the police "set up scenarios that they believed was the way the incident occurred," but "based on the testimony of the doctors, *** the premise was physically wrong." Counsel then argued B.C. did not have the injuries the police presented to defendant. Counsel further argued defendant was upset by "two authority figures breathing down his neck" and falsely accusing him of "practically killing" B.C., whom defendant loved and took into his home. Counsel further argued:

> "And remember when the interview ended, 4:17 in the morning. Three-and-a-half hours. You sat through it. And he sat through it. Under those conditions, under those circumstances, how reliable are those statements? How reliable is that—or how valuable is what was done at that exercise when, first of all, the premise was wrong, the injuries were wrong, the manner in which the—they didn't know. They're not doctors."

Counsel further stated:

> "The officers also had presented theories to [defendant] about that he had shaken the baby. Did the doctors ever talk about Shaken Baby Syndrome? Did the doctors ever mention, well, we believe that the child was shaken and that was what caused injuries? No. They said he [sic] had—he [sic] had head trauma. They didn't say he [sic] had— that the baby was shaken. They [sic] didn't say he [sic] had—that the baby had any spinal injuries. Cops picked that up, and that's when

- 13 -

they were trying to get him to admit certain things to fit their theory of the case. Three-and-a-half hours in the wee hours of the morning."

Counsel also argued Sonya's testimony lacked credibility.

¶ 36    The jury found defendant guilty. Defense counsel filed a motion for a new trial, arguing the trial court erred in denying the motion to suppress because defendant's statements were not voluntary. The court denied the motion.

¶ 37                                C. Sentencing

¶ 38    At sentencing, the State did not offer specific evidence in aggravation. The presentence investigation report showed defendant had no serious previous convictions. He had two previous minor traffic offenses for speeding and operating an uninsured motor vehicle. Defendant was a high-school graduate and had been employed full-time before his arrest. There were no reports of serious mental-health issues or drug use, although he reported he used cannabis and alcohol and had tried cocaine on one occasion. Defendant stated he was not a violent person, stated he had respect for the justice system, and stated, "I'm incredibly sorry for any wrongdoing I may have done." However, he also stated he thought the situation was "handled wrong" and the "outcome was wrong." He also stated, "If there was really an investigation and everyone was talked to, things would be different."

¶ 39    Sonya and her grandmother provided written victim impact statements and read those to the trial court. Both spoke of the emotional difficulties and financial hardships caused by B.C.'s injuries. Sonya addressed the severity of the injuries and the long recovery period. She stated B.C. suffered developmental delays because of the injuries and N.C. was psychologically affected. Sonya stated N.C. told her that, on the day of B.C.'s injuries, defendant threw B.C. down while he was standing up, kicked her in the head, picked her up by her arms, threw her on

the couch, and punched her in the face. N.C. told another person the same thing without changing the details. N.C. also said defendant previously punched her in the belly. The State sought a sentence of 23 years' incarceration.

¶ 40　　　　Four people testified on defendant's behalf, telling the trial court defendant was not a violent or angry person and was a good caregiver, including caring for a friend who had cerebral palsy. The witnesses stated defendant would comply with any conditions of his sentence. Defendant's supervisor at his place of employment stated defendant would be welcome to return to work upon his release. Sixteen people provided letters in support of defendant.

¶ 41　　　　Defendant gave a statement in allocution, stating only the following: "I just want to apologize and say how sorry I am for this situation, and all of the pain, and the suffering on— on both families and the members of the families, and for that I—I am incredibly sorry." The defendant asked for the minimum sentence of six years' incarceration.

¶ 42　　　　The trial court found defendant's lack of criminal history a statutory factor in mitigation. The court also noted defendant's young age, education, and employment history as "substantial" mitigation. The court stated the only factor in aggravation was "the deterrent factor," and it further stated, "[t]his court has to fashion a sentence that will not only deter [defendant], but other individuals similarly situated from committing this type of an offense." The court noted the "circumstances surrounding the offense," including the severity of the injuries and the amount of force required to cause them and stated, "[t]he abuse that was inflicted upon this child was horrific." Ultimately, the court found, while there were numerous letters attesting to defendant's good character, the offense was deterrable and the court must "fashion a sentence that tells other individuals who are similarly situated that this type of conduct, this

atrocious behavior is not going to be tolerated, it cannot be tolerated by society." The court then imposed a sentence of 20 years' incarceration.

¶ 43    On December 6, 2017, defense counsel filed a motion to reduce sentence, alleging defendant's sentence was too severe because the trial court "relied far too heavily on the deterrence factor" and failed to adequately consider mitigating evidence. However, defense counsel did not file an accompanying notice of motion or take any other action on the motion. On August 5, 2021, defendant filed a *pro se* letter requesting an update as to the status of the motion. The court, proceeding under a different judge, held a status hearing. After the hearing, the State moved to strike the motion to reduce sentence, arguing the court lacked jurisdiction to proceed on the merits of the motion. On December 2, 2021, the court granted the State's motion and struck defendant's motion to reduce sentence. The court also stated, even if it were to address the merits, it would deny the motion because defendant was sentenced within the statutory range and based on the information at the time of sentencing, it could not say the sentence imposed by the previous judge was inappropriate.

¶ 44                                    D. Appeal

¶ 45    Defendant appealed and we dismissed for lack of jurisdiction. *Collins*, No. 4-21-0754 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)). On December 7, 2022, the Illinois Supreme Court entered a supervisory order directing this court to vacate its order dismissing the appeal for lack of jurisdiction and to consider the appeal on the merits. *Collins*, No. 129128 (Ill. Dec. 7, 2022) (supervisory order). Accordingly, on December 8, 2022, we vacated our judgment dismissing the appeal for lack of jurisdiction in compliance with the supervisory order and now consider the merits of the appeal.

¶ 46                                    II. ANALYSIS

- 16 -

¶ 47 Defendant argues (1) ineffective assistance of trial counsel based on counsel's failure to seek redactions of portions of the police interview and (2) his sentence was excessive when the trial court relied solely on deterrence when fashioning the sentence.

¶ 48 A. Ineffective Assistance of Counsel

¶ 49 Defendant first contends his trial counsel was ineffective for failing to request redactions to the recording of the police interview to exclude references to "shaken baby syndrome," "brain shearing," and other injuries, when there was no evidence B.C. sustained those injuries. We note the officers in the recording did not specifically use the term "shaken baby syndrome." However, they did refer multiple times to "shaking," or that they believed defendant "shook" B.C., and to "coup contrecoup, which is shaking." Defendant also argues counsel was ineffective for failing to seek redactions of his references to material about drugs or "weed" being on his phone.

¶ 50 The sixth amendment guarantees a defendant the right to effective assistance of counsel at all critical stages of a criminal proceeding. U.S. Const., amend. VI; *People v. Hughes*, 2012 IL 112817, ¶ 44, 983 N.E.2d 439. A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test from *Strickland v. Washington*, 466 U.S. 668. *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61, 115 N.E.3d 1148. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88, 129 N.E.3d 755. If there is no prejudice, we need not decide whether counsel's performance was deficient. *People v. Evans*, 186 Ill. 2d 83, 94, 708 N.E.2d 1158, 1164 (1999).

¶ 51    To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). A defendant is only entitled to competent, not perfect representation. *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285. " '[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]' " *People v. Manning*, 241 Ill. 2d 319, 334, 948 N.E.2d 542, 551 (2011) (quoting *Strickland*, 466 U.S. at 689).

¶ 52    Prejudice is established when a reasonable probability exists, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *People v. Moore*, 2020 IL 124538, ¶ 29, 161 N.E.3d 125. "[T]here is a strong presumption of outcome reliability, so to prevail [on an ineffective assistance claim], a defendant must show that counsel's conduct 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *People v. Pineda*, 373 Ill. App. 3d 113, 117, 867 N.E.2d 1267, 1272 (2007) (quoting *Strickland*, 466 U.S. at 686).

¶ 53    "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141

(2009). In resolving issues related to counsel's performance, reviewing courts must consider the totality of counsel's conduct, not just an isolated incident. *People v. Hamilton*, 361 Ill. App. 3d 836, 847, 838 N.E.2d 160, 170 (2005).

¶ 54 "To be admissible, evidence must be relevant." See Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Logan*, 2022 IL App (4th) 210492, ¶ 111 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). "Even if relevant, however, 'evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Logan*, 2022 IL App (4th) 210492, ¶ 111 (quoting Ill. R. Evid. 403 (eff. Jan. 1, 2011)).

¶ 55 "Statements made by police officers when questioning a defendant, including opinions and observations regarding the defendant's guilt or credibility, are generally relevant and admissible to demonstrate the statements' effects on the defendant, to provide context to the defendant's responses, or to explain the logic and course of the officers' interview or investigation." *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56, 144 N.E.3d 469 (citing *People v. Moore*, 2012 IL App (1st) 100857, ¶ 52, 964 N.E.2d 1276; *People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 33-37, 963 N.E.2d 378; *People v. Munoz*, 398 Ill. App. 3d 455, 488, 923 N.E.2d 898, 925 (2010)). "Such is the case even if the statements themselves would not be admissible as direct testimony." *McCallum*, 2019 IL App (5th) 160279, ¶ 56. "However, a police officer's opinion statement regarding the ultimate question of fact possesses significant prejudice as the officer is a recognized authority figure." *People v. Hardimon*, 2017 IL App (3d) 120772,

¶ 35, 77 N.E.3d 1184. Thus, "[a]n officer's testimony or statement during a *** recorded interrogation is ultimately subject to relevancy requirements, as well as the familiar test weighing probative value versus prejudicial effect." *Hardimon*, 2017 IL App (3d) 120772, ¶ 35 (citing *People v. Patterson*, 192 Ill. 2d 93, 114-15, 735 N.E.2d 616, 629 (2000)).

¶ 56        Defendant relies on *Hardimon* in support of his claim of ineffective assistance of counsel. In *Hardimon*, the defendant was interviewed by investigators following a fatal shooting outside a nightclub where the defendant had allegedly argued with the victim and had been kicked out. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 15-24. During the interview, the defendant acknowledged he had been outside the club when the shooting occurred but denied any involvement in the shooting or being ejected from the club following an argument. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 18-19. At trial, a redacted video recording of the interview was shown to the jury, and the defendant was found guilty of first degree murder and unlawful possession of a weapon by a felon. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 15, 29. On appeal, the defendant argued he had been denied effective assistance of counsel due to his attorney's failure to file a motion to further redact the final two-thirds of the recording, which he contended was irrelevant and more prejudicial than probative. *Hardimon*, 2017 IL App (3d) 120772, ¶ 32.

¶ 57        The Third District agreed and reversed and remanded for a new trial. In doing so, the *Hardimon* court noted the first 20 to 30 minutes of the interview included relevant discussions and admissions. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 34, 36. However, after approximately 30 minutes, the tenor of the interview shifted from conversational to accusatorial and, during the remaining 50 minutes, the police pressured and goaded the defendant to confess, despite his persistent claims of innocence. *Hardimon*, 2017 IL App (3d) 120772, ¶ 36. The investigators also made numerous irrelevant and prejudicial statements, which included repeated

accusations of guilt, suggestions the defendant was a liar and a cold-blooded killer, comments as to how easy it would be for the State to convict the defendant, and implications a jury would view the defendant with disgust. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 21-24, 34, 36.

¶ 58        The *Hardimon* court noted statements made by investigators during an interview are admissible to demonstrate the defendant's responses or the statements' effects on the defendant. However, the *Hardimon* court determined, because the defendant had not changed his version of events during the final two-thirds of interview, that portion was not relevant and was highly prejudicial. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 37-38. Thus, defense counsel's performance was deficient for failing to file a motion to redact that part of the interview. *Hardimon*, 2017 IL App (3d) 120772, ¶ 37. Because the totality of the evidence failed to directly connect the defendant to the crime, the court further concluded the defendant had demonstrated resulting prejudice. *Hardimon*, 2017 IL App (3d) 120772, ¶ 39. Applying *Hardimon*, the First District has similarly found statements from a police interview irrelevant and highly prejudicial when the defendant consistently denied involvement in the crime. *People v. Davila*, 2022 IL App (1st) 190882, ¶¶ 64-65.

¶ 59        However, the Third District declined to extend *Hardimon* where, as here, counsel used unredacted statements to advance the defense theory of the case. In *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 3, 127 N.E.3d 604, police responded to a call of an infant not breathing at an apartment where the defendant lived with his girlfriend, Leila, and her infant son, J.M. When the police arrived J.M. had no pulse, and there were obvious injuries to his head. *Dunbar*, 2018 IL App (3d) 150674, ¶ 3. Additional injuries were discovered at the hospital, where he was pronounced dead. *Dunbar*, 2018 IL App (3d) 150674, ¶¶ 4, 12. When the police interviewed the defendant, he indicated J.M. had been put to bed without incident at approximately 10 p.m. and

was fine when given a bottle around 2 or 3 a.m. *Dunbar*, 2018 IL App (3d) 150674, ¶ 6. However, when Leila checked on J.M. about 30 minutes later, J.M. was not breathing. *Dunbar*, 2018 IL App (3d) 150674, ¶ 6. When asked how J.M. might have been injured, the defendant theorized, "maybe J.M. had hit his head somehow." *Dunbar*, 2018 IL App (3d) 150674, ¶ 6. As the interview progressed, the officers became more aggressive in their interview tactics. However, defendant continued to deny he had committed any offense.

¶ 60        At trial, the jury was shown a video recording of the interview. *Dunbar*, 2018 IL App (3d) 150674, ¶ 16. During closing arguments, defense counsel argued the defendant had not succumbed to the officers' interrogation techniques because he was being forthright and truthful. *Dunbar*, 2018 IL App (3d) 150674, ¶ 19. The jury found the defendant guilty of first degree murder and aggravated battery of a child. *Dunbar*, 2018 IL App (3d) 150674, ¶¶ 1, 20. On appeal, the defendant argued his defense counsel was ineffective for failing to move to redact the portions of the interview "in which meaningful conversation between [the] defendant and the detectives ground to a halt." *Dunbar*, 2018 IL App (3d) 150674, ¶ 51.

¶ 61        The Third District distinguished the case from *Hardimon* and rejected the defendant's ineffective-assistance-of-counsel claim. The court first noted that, generally, counsel's decision regarding whether to file a motion to suppress is " 'a matter of trial strategy which will be accorded great deference.' " *Dunbar*, 2018 IL App (3d) 150674, ¶ 51 (quoting *People v. Wilson*, 164 Ill. 2d 436, 454-55, 647 N.E.2d 910, 920 (1994). Next, the court observed defense counsel's comments demonstrated counsel was using the contested portions of the interview to highlight and disparage the investigating officers' usage of interrogation techniques, while simultaneously painting defendant as calm, forthright, and truthful. *Dunbar*, 2018 IL App (3d) 150674, ¶ 51. That differed from *Hardimon*, where there was no evidence defense counsel

"utilized the contested portions of the defendant's interview to craft an argument." Thus, the *Dunbar* court found counsel's failure to file a motion to redact a matter of trial strategy. *Dunbar*, 2018 IL App (3d) 150674, ¶ 53. Next, the court found, even assuming counsel had filed a motion to redact, the defendant's entire interview would have been admissible as relevant and probative. *Dunbar*, 2018 IL App (3d) 150674, ¶ 54. The court found the statements made during the defendant's interview did not rise to the same prejudicial level as the statements in *Hardimon*. *Dunbar*, 2018 IL App (3d) 150674, ¶ 54.

¶ 62      The Fifth District has applied *Dunbar* to similarly distinguish *Hardimon*. *McCallum*, 2019 IL App (5th) 160279, ¶¶ 60-65. The Fifth District further distinguished *Hardimon* when, as the interview progressed, the defendant continued to make statements with probative value and his alibi changed. *McCallum*, 2019 IL App (5th) 160279, ¶ 68. This court has also distinguished *Hardimon* when a defendant continued to make incriminating statements with probative value. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 57, 103 N.E.3d 1096.

¶ 63      Likewise, we find *Hardimon* distinguishable. Unlike in *Hardimon*, counsel here specifically sought to allow the jury to hear the full recording and then used the inaccuracies stated by the officers to argue defendant was pressured into agreeing he may have caused B.C.'s injuries. During trial, counsel objected to testimony about specific statements made by defendant and argued instead the jury "should hear the tape as is." The trial court agreed the testimony would tend to highlight certain parts of the recording and sustained the objection. Defense counsel then used the recording in closing to argue defendant's statements to the police should be discounted when the police "hammered," "pushed," and "prodded" defendant with various inaccurate scenarios to try to cajole defendant into confessing. For example, counsel noted B.C. did not have the injuries the police presented to defendant, telling the jury: "How reliable is

that—or how valuable is what was done at that exercise when, first of all, the premise was wrong, the injuries were wrong, the manner in which the—they didn't know. They're not doctors." Thus, counsel's actions reflect a specific trial strategy to allow the jury to hear the entire interview and then use the inaccuracies in the interview to disparage the officers' interview tactics and cast doubt about defendant's confession.

¶ 64       Counsel has the ultimate authority to direct trial strategy, and we will generally not sustain a claim of ineffectiveness of counsel based on inadequate trial strategy except where counsel entirely fails to conduct any meaningful adversarial testing. *People v. Segoviano*, 189 Ill. 2d 228, 248, 725 N.E.2d 1275, 1285 (2000). Here, counsel conducted meaningful adversarial testing of the officers' conduct and credibility, and we believe this strategy was sound considering the overwhelming evidence defendant seriously injured B.C. through an excessive amount of adult force.

¶ 65       We further note, unlike in *Hardimon*, defendant did not continue to deny his involvement throughout the interview. Instead, defendant's story changed from one of complete innocence to admissions of actions potentially causing the injuries, and he continued to add statements of culpability throughout the interview in response to the interrogation tactics. As those tactics and the evolution of defendant's story involved an ongoing exchange that took place over the course of the interrogation, it would have been challenging for counsel to seek redaction of certain "snippets" of the interview. See *People v. Quezada*, 2022 IL App (2d) 200195, ¶ 59. In addition, the *Hardimon* court indicated the police tactics became forceful and confrontational. That was not the case here. While the police told defendant they did not believe him and presented various theories of what occurred, they remained respectful and conversational in tone

throughout the interview, as compared to the aggressive tone seen in *Hardimon*. See *McCallum*, 2019 IL App (5th) 160279, ¶ 70.

¶ 66　　　　In any event, even if we were to find trial counsel's performance fell below an objective standard of reasonableness, we are confident redacting the mentions to shaking or brain shear would not have changed the outcome of the trial. The recording of the interview was 3 hours and 20 minutes long. References to shaking, "coup contrecoup," and "brain shear" occurred in relatively brief portions of the interview. Further, the jury listened to the unredacted recording only once, without the benefit of a transcript, and the State also did not utilize the contested portions to craft an argument. See *Logan*, 2022 IL App (4th) 210492, ¶ 112; *McCallum*, 2019 IL App (5th) 160279, ¶ 70.

¶ 67　　　　Meanwhile, the evidence of defendant's guilt was overwhelming. The uncontroverted expert medical evidence showed B.C.'s injuries were caused by an adult-level use of force, which would manifest in immediate symptoms. Further, Dr. Reifstack said the injuries would have happened almost immediately before the onset of symptoms. As defendant was the only adult present, and the symptoms occurred when B.C. was exclusively in his care, defendant's circumstantial evidence of a previous illness or accident, or theory of an injury caused by another child, lacked meaningful credibility. The State presented compelling evidence, and we are convinced none of the suggested redactions would have changed the jury's finding of guilt. Accordingly, given the overwhelming evidence against defendant, we conclude defendant has failed to demonstrate, absent counsel's alleged errors, a reasonable probability exists the outcome of the trial would have been different. See *Logan*, 2022 IL App (4th) 210492, ¶ 119 (citing *Moore*, 2020 IL 124538, ¶ 29).

¶ 68        Defendant also argues counsel rendered ineffective assistance by failing to seek redaction of references to drugs or "weed" on defendant's phone. The recording includes a brief mention of defendant's concern there was evidence about "weed" on his phone. We agree that mention was not relevant to the case. However, assuming, *arguendo*, counsel's performance fell below an objective standard of reasonableness for failing to seek to redact that portion of the recording, for the reasons previously discussed, we are confident the suggested redaction would not have changed the jury's finding of guilt. The reference was brief, and the officers themselves stated any such evidence was not important to them. Meanwhile, as previously stated, the evidence against defendant was overwhelming.

¶ 69                    B. Excessive Sentence Argument

¶ 70        Defendant next argues his 20-year sentence was excessive when the trial court relied exclusively on deterrence. He also argues the court failed to adequately consider the mitigating evidence.

¶ 71        "[A] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Little*, 2011 IL App (4th) 090787, ¶ 22, 957 N.E.2d 102. The trial court has discretion when sentencing, and we will not reverse the court's decision absent an abuse of that discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.

¶ 72        In determining what sentence to impose, the trial court may consider (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34. The seriousness of the offense is the most important sentencing

factor, and the trial court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense. *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 112.

¶ 73    "The trial court is not required to expressly indicate its consideration of all mitigating factors and what weight each factor should be assigned." *People v. Kyse*, 220 Ill. App. 3d 971, 975, 581 N.E.2d 285, 288 (1991). Instead, it is presumed the trial court considered all relevant mitigating and aggravating factors in fashioning a sentence, and that presumption will not be overcome absent explicit evidence from the record the trial court failed to consider mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158, 935 N.E.2d 1151, 1155 (2010). We may not substitute our judgment for that of the trial court merely because we might have weighed a factor differently. *Klein*, 2022 IL App (4th) 200599, ¶ 37.

¶ 74    Here, defendant's sentence of 20 years' incarceration was well within the statutory range. Aggravated battery of a child, causing great bodily harm, is a Class X felony. 720 ILCS 5/12-3.05(b)(1), (h) (West 2014). A Class X felony is punishable by a determinate sentence of not less than 6 years and not more than 30 years and is not subject to probation or conditional discharge. 730 ILCS 5/5-4.5-25(a), (d) (West 2014).

¶ 75    The trial court had broad discretion in imposing sentence. In exercising that discretion, a court may logically consider the need for deterrence as a factor in the imposition of a sentence. See *People v. Cameron*, 189 Ill. App. 3d 998, 1009-10, 546 N.E.2d 259 (1989). Here, the court's consideration of deterrence was reasonable and well within the exercise of its discretion.

¶ 76    Further, we disagree deterrence was the only factor applied by the trial court. The seriousness of the offense is the most important sentencing factor, and the court here discussed "the circumstances surrounding the offense" in addition to its discussion of the need for

deterrence. In doing so, the court rightfully noted the seriousness of the abuse suffered by B.C.

Finally, defendant argues the court failed to give adequate weight to factors in mitigation and his

potential for rehabilitation. But the court clearly stated it considered those factors. The court was

not required to give greater weight to rehabilitation or mitigating factors than to the severity of

the offense, nor will we reweigh those factors. Accordingly, the court's imposition of a 20-year

sentence was not an abuse of discretion.

¶ 77                                    III. CONCLUSION

¶ 78          For the reasons stated, the judgment of the trial court is affirmed.

¶ 79          Affirmed.